THE BARRYTON.

OSTERHOUDT v. HEDGER TRANSP. CO., Inc.

No. 43.

Circuit Court of Appeals, Second Circuit.

Nov. 2, 1931.

Single & Hill, of New York City (C. Welmore Robinson, of New York City, of counsel), for appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for the tug Barryton.

Haight, Smith, Griffin & Deming, of New York City (James McKown, Jr., and Stanley W. Schaefer, both of New York City, of counsel), for Hedger Transp. Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Osterhoudt owned two barges, "The Freedom" and "The Adam Schumann," which he chartered to the Hedger Transportation Company for use upon the Barge Canal and the Great Lakes, the right to use them upon the Lakes being conditional upon the charterer's having "satisfied the Owner with full insurance coverage" at its expense. Osterhoudt was to deliver in New York and the charterer to redeliver there likewise; hire to cease, "should barge or barges be lost." While in tow of the tug, "Barryton," the barges went ashore in Lake Erie on November 5, 1926, in circumstances which charged both her and the charterer with the loss. The "Schumann" was a total loss, but the "Freedom" was eventually got off the strand in April, 1927, brought to Buffalo, where she was sold under the salvor's libel, at a figure not disclosed. The only question here is as to the amount of the recovery.

Osterhoudt and Hedger, the charterer's president, both lived in New York, and upon learning of the accident Hedger tendered the "Freedom" to him as she lay on the strand. Osterhoudt refused to take her, and Hedger sent his agent to the place to do what he could; Osterhoudt followed, saw the "Freedom," but took no action. Finding the salvage more difficult than had been expected, Hedger contracted with one, Ormerod, to lift the barge off the strand and tow her to Buffalo, at an agreed cost of $3,800. After much difficulty Ormerod succeeded, and, Hedger refusing to pay the charge, libeled her in the spring of 1927. He then offered to pay Hedger $2,000 for her in Buffalo, releasing his salvage lien, and Hedger relayed the offer to Osterhoudt, who refused it. Hedger, apparently through inadvertence, had not insured the barges, though upon two earlier voyages during the summer he had taken out valued policies on each of $10,000, in which amount he made it a practice to insure all his chartered barges, of which he had many.

After interlocutory decree for the libellant (42 F.(2d) 561) the cause went to a commissioner to assess damages. Widely different estimates of value were given for each barge, from which the commissioner fixed the "Freedom's" at $9,500 and the "Schumann's" at $4,900. He also fixed the value of the "Freedom" on the strand at $4,500, depending for this upon the opinion of Ormerod, the only witness on that question. He held that Hedger's obligation to redeliver ended with the stranding, and that Osterhoudt should have accepted his tender of her as she lay. Thus he awarded against the respondent and the claimant, $3,000, for the "Freedom," and $4,900 for the "Schumann." The court confirmed the award, having previously refused to allow anything for Hedger's failure to insure, on the theory that he was not bound to underwrite more than the actual value of the barges. Osterhoudt appealed, contending that Hedger was bound to take out valued policies of $10,000; also that in any event the values awarded were too small, and that as to the "Freedom," he was not obliged to accept Hedger's tender, or to take any other action to keep down his damages.

Osterhoudt's first position depends upon the assumption that Hedger had promised to insure the barges under valued policies of $10,000. The charter-party contained no such express promise; it merely gave the charterers power to "designate" Lake ports "providing they have satisfied the Owner with full insurance coverage." We may assume that it was a conversion to use them on the Lakes without insurance, but the damages for that—if it was justiciable in the admiralty at all—would depend upon their value, and not of the policies which should have been underwritten. Perhaps it is reasonable to imply a promise not to use the barges upon the Lakes uninsured. If so, this in form

was a maritime undertaking and not a promise to insure; but in substance it is indistinguishable from such a promise. It did not bind the promisor to keep the barges in the Barge Canal, but only to insure them if he took them out, exactly what he would have had to do, if he had promised to insure them in, that event. The measure of a promise is the extent to which it constrains the promisor's liberty of action, or conversely, the performance which it insures to the promisee. Whether put negatively or affirmatively the constraint and the performance would here be the same; insurance, if the condition arose. Rightly or wrongly we are committed to the doctrine that the breach of a promise to insure, even when an incident to a contract otherwise strictly maritime, is not justiciable in the admiralty. Royster v. Hedger (C. C. A.) 48 F.(2d) 86. There are embarrassments in this, and to me at any rate it seems that the opposite result might have been reached without sacrifice of principle; but it is undesirable to introduce niceties when nothing is at stake but the forum. Unless we are to overrule this doctrine, Osterhoudt may not here invoke Hedger's promise not to use the barges uninsured on the Lakes, even though one should be implied, and though it contemplated taking out valued policies. We therefore disregard this part of the appeal.

■ All that is left is the proper valuation of the barges, and whether Osterhoudt should be charged with neglect to keep down his damages. The evidence was of the kind common, and indeed inevitable, since there was no market; that is, the opinions of persons who dealt in barges. Each side called several witnesses whose estimates were very far apart; the commissioner chose a figure between the extremes and it is more likely to be right than any we might substitute, for we have not the corrective which his senses provided. The only questionable valuation was of the "Freedom" on the strand, $4,500. This the commissioner found by averaging the two estimates of Ormerod, the only witness, $4,000 to $5,000. Yet when he brought her to Buffalo Ormerod was willing to offer only $2,000 for her, though the risk of the operation was then ended. Of course it does not follow that his bid was her full value, but at least it tends to impugn his estimate. Moreover a valuation of $4,500 leaves only $1,200 for her repairs. We are not satisfied that she was worth so much; we think that the commissioner should have gone somewhat lower than Ormerod's figures. We fix the value of the "Freedom" before she was

wrecked at $9,500; afterwards, at $3,500; of the "Schumann" at $4,900.

■ As to the tug, Osterhoudt was bound to take reasonable action at once and was charged with the value of the barges on the strand. The "Schumann" was a total loss, and nothing should be deducted. If the "Freedom" was worth $3,500 it was recoverable by proper exertions, and he must abate so much. Other considerations govern his duty as to Hedger. We cannot agree—apparently the learned District Judge was at least in doubt—that Hedger's obligation ended when the "Freedom" took the strand. Obviously she was not lost, and his promise to return her to New York remained. This he did not at once repudiate, even though we accept his word that he tendered her to Osterhoudt where she lay. He busied himself to get her off, made the contract with Ormerod when his agent failed, and gave no indication of being through with the job until she was in Buffalo. These activities while they lasted absolved Osterhoudt from bestirring himself to keep down his damages; no action was required of him as long as Hedger appeared to be discharging his obligations.

■ However, after Ormerod made his claim for salvage and Hedger refused it, the situation changed. The barge was probably subject to a lien, and at any rate under arrest. Unless somebody released her, or successfully defended the suit, she would be sold, as she was in fact. Hedger declined to go further, an unequivocal declaration in such circumstances that he was not going to redeliver. We can see no escape from the conclusion that he then repudiated his promise, and that Osterhoudt was called upon to make the damages as low as possible. After Hedger had relayed Ormerod's offer of $2,000 to him, Osterhoudt had four courses open: To let the barge be sold as he did; to defend the suit; to pay Ormerod's claim; to accept the offer. The first appears to us plainly unreasonable; a marshal's sale of a wrecked barge would certainly bring very little. The only defence to the suit was that Ormerod had not returned the barge within the stipulated time as extended. That was up on April 15, 1927, and Ormerod got the barge to Buffalo on the sixteenth; it was very doubtful whether such a delay would have forfeited the salvage in spite of the stringent provisions of the original contract. In any case the contest would involve time and expense. It seems to us therefore that the choice lay between the third and fourth courses. If the barge was worth

$3,500 on the strand she was worth at least as much in Buffalo and Osterhoudt had only to pay off the lien to get her. This we think he should have done and we charge him with this amount upon his claim against Hedger as well as upon that against the tug.

Decree modified by awarding $6,000 instead of $5,000 for the "Freedom" and as modified affirmed.