**ELLERMAN LINES, LIMITED, as Owner of THE Steamship CITY OF BRISTOL, Libelant,**

v.

**THE Steamship PRESIDENT HARDING and American President Lines, Ltd., Claimant-Respondent.**

United States District Court
S. D. New York.
Oct. 4, 1960.

Kirlin, Campbell & Keating, New York City, for libelant. John F. Gerity and Robert M. Auld, New York City, Advocates.

Symmers, Fish & Warner, New York City, for claimant-respondent.

FREDERICK van PELT BRYAN, District Judge.

This suit in admiralty arises out of a collision on February 11, 1955 between the S.S. President Harding owned by claimant-respondent American President Lines, Ltd., and the S.S. City of Bristol owned by libelant Ellerman Lines, Limited. As the result of a settlement an interlocutory consent decree was entered awarding libelant 80% of the libelant's proved damages. The parties were in agreement as to the damages except for certain additional pier and unloading charges amounting to $16,474.31 which remained in dispute. The interlocutory decree provided that the case be referred to Thomas H. Middleton, Esq., as Commissioner, to ascertain whether libelant was liable for such additional damages and empowered him to tax the costs of the reference.

The Commissioner found that all of the additional charges were proven and reasonable and proper items of damage, and awarded the libelant 80% thereof, or $13,179.45. He also found that the claimant-respondent should be charged for the full costs of the reference.

The claimant-respondent has now filed exceptions to the Commissioner's report, challenging his findings that it was liable for the additional damages awarded or for the full costs of the reference.

The facts are as follows:

On February 11, 1955 at about 1:30 p. m. the City of Bristol was anchored about a half mile north of Ambrose Channel fairway buoy, in New York, in a heavy fog. While so anchored she was struck by the outbound President Harding on the starboard side at the No. 2 lower hold. She rapidly began to take water.

Within a few minutes the Master of the City of Bristol informed libelant's agents on land of the collision. By 2:00 p. m. the agents were informed that there was four feet of water in the No. 2 hold and that it was still rising. At 3:00 p. m. the City of Bristol weighed anchor and headed for the Todd Shipyards. The situation continued to deteriorate. At 3:20 p. m. the Master sent another message to shoreside personnel. "Now five feet water in hold still rising. Proceeding up channel". By 6:00 p. m. the City of Bristol reached Todd's Shipyard.

Shoreside a number of immediate decisions were required. Ellerman Lines had as its general agents in New York City, Norton, Lilly & Co. It also employed in New York a permanent Marine Superintendent, Captain Hugh Lynes. Norton, Lilly & Co., acting through one of its partners, Mr. Clarence I. Peters, and the Marine Superintendent worked together. Their experience and competence are not questioned. They arranged to use a graving dock at the Todd Shipyards, dispatched a tug to assist the City of Bristol, and wired instructions to the Master.

The vessel had on board some 7,700 tons of cargo of which some 3,200 tons were to be discharged at New York. Part of the cargo in the lower hold was jute which was absorbing water.

On the basis of the Master's messages Peters and Lynes decided that all of the cargo would have to be unloaded because of the precarious situation of the vessel.

The ship was originally scheduled to dock at Pier 5, The Ellerman Lines' regular pier. Since Pier 5 and adjacent Pier 2 did not have enough cargo space available for a complete unloading Peters engaged Pier 6 at a rental of $450 per day, reduced from the asking price of $1,000 per day. Using Pier 6 rather than Pier 5 resulted in the additional expenses of $16,474.31. It is these additional charges to which claimant-respondent objects.

Under the terms of the engagement of Pier 6 libelant was to pay for the use of the pier only if the ship actually docked there. There was no obligation on libelant's part to use the pier.

Immediately after arranging for the use of Pier 6 stevedores were engaged to unload the ship on Sunday, February 13. Saturday was Lincoln's Birthday and a legal holiday. The task of obtaining longshoremen was not an easy one. Under union rules only certain men were permitted to work on Pier 6. Since Pier 6 had been vacant for over a year these men were not easily to be found. It cost over $42 in telephone calls to hire longshoremen. Ordinarily a single telephone call is sufficient.

Also because of union rules the men had to be reached before 4:00 p. m. Friday if they were to work on Sunday. Thus, Captain Lynes and Peters were working under severe time pressure not only because of the need to save the ship but also because union working rules required a decision by 4:00 p. m. Friday.

In addition to securing the use of Pier 6 and hiring longshoremen to work it on Sunday, Lynes and Peters had arranged to have the underwriters' and salvage association's marine surveyors examine the ship at the shipyard and to oversee whatever temporary repairs were necessary.

When the ship reached Todd's Shipyard her bow was placed in a graving dock, and Captain Lynes and various surveyors descended into the No. 2 lower hold. They discovered a gash over three feet long below the water line. There was also other damage, the full extent of which could not be ascertained without unloading cargo. They finished their examination at about 10:00 p. m. Friday. Peters had left his office for his home at around 7:00 p. m. It was then decided that temporary repairs should be made by building a cement box over the gash.

Claimant-respondent contends that when the examination was completed at 10:00 p. m. on Friday the engagement to use Pier 6 should have been cancelled and the vessel should have been docked at the regular Pier 5. It argues that by then it should have been clear that the entire cargo did not have to be unloaded and that Pier 5 was adequate. Since some $16,000 could have been saved by using Pier 5, the claimant-respondent argues that libelant failed in its duty to mitigate damages and that the Commissioner was in error in refusing to so find.

█ There is no doubt that the owner of a struck ship has the duty to mitigate damages. Brooklyn Eastern District Terminal v. United States, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240; Westchester Fire Ins. Co. of New York v. Pennsylvania R.R. Co., 2 Cir., 96 F.2d 133; The Barryton, 2 Cir., 54 F.2d 282. It is equally clear that he is required only to use good faith and reasonable diligence in so doing. He is not required to use the best judgment possible or adopt the wisest course which hindsight might have dictated. The Algonquin, 2 Cir., 70 F.2d 335; The Walter A. Luckenbach, 9 Cir., 14 F.2d 100. Moreover, the shipowner must take proper precautions to avoid further damage to ship or cargo even though this may involve substantial extra expense. See Pennsylvania Railroad Co. v. Washburn, D.C.S.D.N.Y., 50 F. 335.

The claimant-respondent urges that the Commissioner was in error in relying on the standards of the Luckenbach and Algonquin cases in holding that the libelant did not breach its duty to mitigate. It points out that these cases dealt with masters of damaged vessels at sea who, in an emergency, took a course of action which resulted in further damage in an effort to save the vessels. It urges that the same standards do not apply to shore personnel under the circumstances presented here.

█ No doubt the latitude of action which may be allowed a master at sea in command of a damaged vessel may be greater than that permitted shore personnel charged with making arrangements for accommodation of the vessel and the unloading of her cargo to avoid further damage. This is, however, a matter of degree under all the circumstances. The principle is basically the same—that the action taken in the light of the circumstances must have been in good faith and in the exercise of reasonable diligence and not so illy considered and plainly wrong that competent persons under similar circumstances would have rejected it. The Commissioner's findings that the libelant did not fail in its duty to mitigate damages and that its use of Pier 6 was not so plainly wrong that competent persons in like position would have rejected such a course, are by no means clearly erroneous, as they must be in order for the district court to disturb them. Admiralty Rules 43½, 28 U.S.C.A.; Ozanic v. United States, 2 Cir., 165 F.2d 738, 742; United States v. Kirkpatrick, 3 Cir., 186 F.2d 393, 397.

It is not at all clear that even after the examination of the gash in the hull was completed at Todd's Shipyard at 10:00 p. m. on Friday night it would have been better to use Pier 5 than Pier 6. Captain Lynes testified that the inspection on Friday was only a preliminary one and that "we did not know how much cargo we would have to discharge. * * *. In fact we were quite amazed at the small quantity of cargo we eventually had to take out". The extent of the damage was not fully determined during the examination at Todd's Ship-

yard, and, indeed, after cargo had been removed at Pier 6 further repairs were necessary to the vessel. In addition, the absorbent cargo of jute in the hold entailed dangers which could not be fully evaluated by the Todd Shipyard survey. Pier 5 might well have been unable to accommodate the cargo which had to be unloaded.

The repairs at Todd's Shipyard were not completed until after midday on Saturday. Under union rules, if the ship were not docked at Pier 6 the longshoremen who had already been hired would have had to have been informed before 8:00 a. m. on Saturday morning that their engagement was cancelled. The difficulties in lining up these men have already been mentioned. Whether libelant could have informed the stevedores, and whether the stevedores would have been able to reach the men between 10:00 p. m. on Friday night and 8:00 a. m. Saturday morning, is highly doubtful, even assuming that the Pier 6 arrangements should have been cancelled.

■ Claimant-respondent argues that Peters was the only person who could have cancelled the arrangements for Pier 6 and authorized the ship to be docked at Pier 5, and that since he had gone home at 7:00 p. m. on Friday night he had failed in his duty. With this I cannot agree. By then the ship was safely in the graving dock, with the master, libelant's marine superintendent and the surveyors on hand. There was no reason to believe when Peters went home that Pier 6 might not be needed, and, indeed, it is not established by the record that a change to Pier 5 was desirable except as a matter of hindsight. There was no need under the circumstances for Peters to remain at the shipyard on the off chance that his presence might be needed. Indeed, there is no evidence that his continued presence or greater availability would have resulted in any change of plan or alteration in the decision initially made and not unwisely adhered to.

It is frequently easy in cases like this to say, with the benefit of hindsight, that something different and better could have been done. But the situation must be viewed without the benefit of hindsight. So viewed, the actions of the libelant were not the result of incompetence or negligence, nor were they plainly wrong. The Commissioner applied proper standards and properly found that the libelant did not fail in its duty to mitigate damages. The items of additional expense were a proper item of damage for which the claimant-respondent was liable under the consent decree and the findings of the Commissioner to that effect must be sustained.

Against the background of what has been said it is also clear that the finding of the Commissioner taxing the full costs of the reference against the claimant-respondent was not clearly erroneous.

The exceptions to the report of the Commissioner are overruled and his report is in all respects confirmed.

It is so ordered.