288 F.2d 288
 ELLERMAN LINES, LIMITED, as Owner of THE Steamship CITY OF
BRISTOL, Libelant-Appellee,
v.
THE Steamship PRESIDENT HARDING and American President
Lines, Ltd., Claimant-Respondent-Appellant.
 No. 287, Docket 26701.
 United States Court of Appeals Second Circuit.
 Argued March 7, 1961.
Decided April 5, 1961.
 
 William Warner, New York City (Symmers, Fish & Warner, New York City), for claimant-respondent-appellant.
 William E. Fuller, New York City, (Kirlin, Campbell & Keating, New York City), for libelant-appellee.
 Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 This appeal relates to an item of damages which libelant, Ellerman Lines, Limited, owner of the S.S. City of Bristol, claims to have resulted from a collision with the S.S. President Harding, while the City of Bristol lay at anchor in Ambrose Channel, fog-bound en route to New York, on Friday, February 11, 1955. The item, representing an agreed proportion (80%) of additional pier and unloading charges of $16,474.31 allegedly incurred by libelant due to the collision, was allowed by a commissioner appointed by the District Court for the Southern District of New York, whose award was confirmed by Judge Bryan in a considered opinion reported in 1960, 187 F.Supp. 948.
 
 
 2
 The President Harding had struck the City of Bristol on the starboard side at the No. 2 lower hold. Having informed her New York agents, the City of Bristol weighed anchor at 3 P.M. and headed for the Todd Shipyards in Brooklyn, where the agents had arranged for use of a graving dock. She had 7,700 tons of cargo on board, 3,200 of which were to be discharged at New York. The intention had been to berth her at Pier 5, Bush Terminal Docks and to begin unloading on Monday; other ships were docked at Pier 5 but there was room for another 3,500 tons of cargo. Starting at 2 P.M., the City of Bristol sent various messages reporting the rising of water in the hold. Peters, a partner in the agency firm, and Captain Lynes, libelant's New York marine superintendent, concluded that discharge of 'the majority if not all of the ship's cargo' would be required. Since there would not be room for this at Pier 5 and the neighboring Pier 6 was empty, they obtained the right to use Pier 6 and pay for what space was used. At the same time, around 4 P.M., they arranged to have longshoremen available to unload the ship on Sunday at Pier 6.
 
 
 3
 The City of Bristol reached todd Shipyards shortly after 6 P.M. Lynes was on hand; Peters had gone home at '5:00 or 6:00 or 7:00, something like that,' and recalled no further communications with Lynes until Monday morning. During Friday evening the vessel was inspected and the damage found less serious than anticipated. It was decided that she would be able to proceed to a pier and unload after temporary repairs; these were completed before noon on Saturday and the City of Bristol then moved to Pier 6 under her own power. Appellee does not dispute that all the cargo whose removal to a pier proved to be required could have been handled at Pier 5.
 
 
 4
 Despite this appellee contended, and the commissioner and the District Court have held, that since the initial decision to engage Pier 6 was proper, appellee is entitled to the additional costs this entailed; it insists it ought not be expected to act with the advantage of hindsight. Appellant resists appellee's attempt, successful before the commissioner and the District Judge, to place that argument in its mouth; it claims, with considerable persuasiveness, not that appellee should have exercised hindsight, but that, instead of standing on its initial foresight, appellee should have taken another look as the facts unfolded.
 
 
 5
 It is often said, as the District Court did here, 187 F.Supp. at page 951, that a tort plaintiff has a 'duty to mitigate damages.' This form of statement has been criticized, see Burch, J., in Rock v. Vandine, 1920, 106 Kan. 588, 189 P. 157-- probably rightly so since a plaintiff assuredly has no 'duty' in the Hohfeldian sense of the correlative of a right, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 30-32 (1913). The formulation now fashionable is that the defendant is not liable for 'avoidable consequences.' American Law Institute, Restatement of Torts, 918; McCormick, Damages (1935), p. 128, 2 Harper & James, The Law of Torts 1956), 25.4. Perhaps as good a way to state the rule as any is that a tort defendant is not liable for consequences preventable by action that reason requires the plaintiff to take; per contra if the plaintiff takes such action within the range of reason, the defendant is liable for further damages resulting therefrom. It seems unnecessary to follow McCormick, pp. 127-128, and the Restatement, p. 602, in findint the root of this rule in a policy of discouraging persons from 'wasting their resources both physical or economic'; it is enough that the community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted.
 
 
 6
 All this is easy enough; the troubles come when the standard of 'reason' must be further refined and applied. It is not fatal to recovery that one course of action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it. 'If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen.' McCormick, supra, at p. 134. The standard of what reason requires of the injured party is lower than in other branches of the law. Surely it is nowhere near so high as the standard of prudence imposed on the fiduciary; McCormick says, ibid.-- and in this respect the current phrasing of the rule may indeed lead to a different and sounder result than the older one-- that 'as a person wronged, he is not to be judged by the same standards as apply to one who has had presented to him the choice of whether he will adopt a course of conduct which will probably injure another,' without explaining why. The explanation can hardly be that 'it is always a conceded wrongdoer who seeks' the protection of the rule, ibid., pp. 133-134; only rarely is the defendant who has been cast for negligence a person whose conduct calls for reprobation. A better reason, applicable in many cases, if not in all, is that the very impact of the injury may leave only what seems a choice of evils, or may produce a tension that partially disables the reasonable man from acting with his usual reasonableness, as witness the wide latitude of judgment accorded masters of vessels damaged at sea, The Algonquin, 2 Cir., 1934, 70 F.2d 335; The Walter A. Luckenbach, 9 Cir., 1926, 14 F.2d 100.
 
 
 7
 Appellant insists with merit that there is no need to allow quite so much latitude in the case of a decision or, more accurately, a failure to reverse a decision, taken on shore, eight hours after a collision, when the danger of truly serious loss has disappeared. Its basic position is that Peters, who knew Pier 6 did not have to be paid for unless used, went home where he did not apply his mind to the developing facts, whereas Lynes, who kept current with the facts, did not apply his mind to them because he did not know the decision to use Pier 6 could be changed. Although the record clearly bears out appellant's position as to Peters, it is somewhat hard to believe that Lynes, who had joined with Peters in hiring Pier 6, was unaware of the terms of the hire and of the feasibility of cancelling the order for longshoremen; however, some of the answers elicited in his cross-examination support that view and we shall assume it to be correct.
 
 
 8
 Still appellee ought not be deprived of recovery if its conduct came within the range of reason, even if the full light of reason was not, in fact, brought to bear. To determine whether appellee's conduct fell within that range, we must look at the developments more closely. When the City of Bristol reached Todd Shipyards, her bow was placed in the graving dock. She was inspected by Lynes, by Webber, principal surveyor for the Salvage Association of London, and by Findlay, surveyor to Lloyd's Registry. From examination of No. 2 hold, both inside and outside, made with the aid of flashlights, it was discovered, in Captain Lynes' words, 'there was a fracture approximately three feetodd long, letting water into the ship.' Water in No. 2 hold had risen as high as 8 feet; some of it also had been soaked up by cargo, mainly ore and jute. 'Going further along, at No. 4 hatch in the way of the sheer strake it way very badly damaged and buckled and a good many rivets sheared off, and also the deck in the way of the sheer strake was buckled and I think about fourteen or fifteen frames-- I can't remember exactly how many-- were also buckled in the way of the sheer strake on the side of the vessel.' '* * * it was decided to endeavor to plug the leak and put some cement boxes on and let her proceed through to Pier 6 where further cargo would be discharged so we could get a better view of the whole damage.' Cement boxes were also installed in the way of No. 4 and No. 5 holds immediately below the main deck.
 
 
 9
 Appellant says to examination conclusively showed that the damage was cofined to No. 2 hold and that the only items of non-New York cargo which would need to be unloaded even from that were a few hundred bales of jute, most of which, having been wetted, were required by port regulations to be unloaded into lighters in any event. We doubt the examination established this with the certainty appellant claims. Lynes testified that the conditions of the stow in No. 2 hold prevented a full examination of the area of the damage there; that, in fact, later examination showed the need of a considerable extension of the temporary repairs to No. 2 hold; and that, until the vessel was moved to Pier 6, 'it was quite unknown' how much cargo would have to be discharged at New York, since apart from the still unresolved question as to the quantity of cargo that would need to be removed from No. 2,[1] it was not certain there had been no damage to other holds. Webber, called as a witness by appellant, confirmed that 'The cargo in number 2 hold precluded a full examination of the starboard shell plating completely down the side' and that 'The full extent of the damage was not known until the cargo and weigh(t) was discharged.'
 
 
 10
 Moreover, even if appellant had shown that a decision to proceed to Pier 6 would have been unreasonable if taken for the first time on the night of February 11, that would not be enough. The momentum of the initial decision, clearly reasonable at the time, must also be taken into account; the desire to avoid the pain of decision often propels us along a course of conduct once determined, although we might not have chosen it in the first instance. A master taught long ago that a 'constant component of the web of motivation is the impulse to persist in a decision once made,' and that such a decision 'does afterward enter as a motive additional to the more genuine resons why it should not be revoked, or if provisionally revoked, why it should not be made again.' W. James The Principles of Psychology (1890), Vol. II, p. 530. Thus, in order to prove that a plaintiff's adjerence to an initially proper decision how to mitigate damages has become unreasonable, the defendant must show that such adherence had become not merely erroneous but palpably so; appellant has not met that burden.
 
 
 11
 The parties have extensively discussed the proper scope of our review, appellee claiming the sole issues to be ones of fact on which the findings of the commissioner and the district judge are entitled to the benefit of the 'clearly erroneous' rule, McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 and appellant contending the appeal raises issues of law. For reasons similar to those stated by Judge Learned Hand with respect to negligence in Sidney Blumenthal & Co. v. Atlantic Coast Line R. Co., 2 Cir., 1943, 139 F.2d 288, 290; Barbarino v. Stanhope S.S. Co., 2 Cir., 1945, 151 F.2d 553, 555, and Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2 Cir., 1947, 159 F.2d 661, 665, definition of the standard of conduct in mitigating damages to which a tort plaintiff must conform is a question of law, whereas determination of what actually happened is a question of fact. An area over which 'law' and 'fact' have battled for a century, see N.L.R.B. v. Marcus Trucking Co., 2 Cir., 1961, 286 F.2d 583, 590 and footnote 3, is the application of a legal standard to objective facts and the drawing of inferences from the latter; this Court, following Holmes' analysis, The Common Law (1881), p. 126, has not regarded cases in this area as presenting only questions of fact within the scope of the 'clearly erroneous' rule, see e.g., in addition to the negligence cases, E.F. Drew & Co. v. Reinhard, 2 Cir., 1948, 170 F.2d 679, 683-684; J. R. Wood & Sons, Inc. v. Reese Jewelry Corp., 2 Cir., 1960, 278 F.2d 157, 158. In Romero v. Garcia & Diaz, Inc., 2 Cir., 286 F.2d 347, certiorari denied 81 S.Ct. 905, we took note of the view of the Ninth Circuit, Pacific Tow Boat Co. v. States Marine Corp., 1960, 276 F.2d 745, 752, apparently shared by the Sixth, Imperial Oil Co. v. Drlik, 1956, 234 F.2d 4, 10, certiorari denied 1956, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236, that our continued adherence to the practice of considering a general finding of negligence to present a question of law was inconsistent with the McAllister decision, although the Ninth Circuit recognized that the articulation of a standard of conduct would present such a question; now the criticism has itself been criticized, Staring, Appeals in Admiralty Cases, 35 Tulane L.Rev. 7, 50, fn. 231 (1960), with force.
 
 
 12
 However all this may be, the issues here raised by appellant must be considered fully open for appellate review.[2] For although the commissioner mentioned appellant's claim that appellee's error was in not reconsidering its decision to proceed to Pier 6, he made no findings on that issue, his discussion relating rather to the propriety of the initial decision; and the District Judge was therefore mistaken in believing there were any relevant findings to which deference on his part was required by Admiralty Rule 43 1/2, 28 U.S.C.A., or any other rule. Considering the case as fully open to review, we nevertheless are constrained to affirm.
 
 
 
 [1]
 The loading plan indicates that if it had proved necessary to remove to a pier all the cargo in No. 2 hold in addition to other New York cargo, this would have overtaxed the capacity available on Pier 5
 
 
 [2]
 Of course, this is not synonymous with 'a trial de novo,' as appellee argues