TRUST FOR THE CERTIFICATE HOLDERS OF THE MERRILL LYNCH MORTGAGE PASS–THROUGH CERTIFICATES SERIES 1999–C1, by and through Orix Capital Markets, LLC, as Master Servicer and Special Servicer, Plaintiff,

v.

LOVE FUNDING CORPORATION, Defendant.

No. 04 Civ. 9890(SAS).

United States District Court, S.D. New York.

Aug. 13, 2010.

Kenneth S. Yudell, Esq., Aronauer, Re & Yudell LLP, Ira M. Feinberg, Esq., Hogan Lovells U.S. LLP, New York, NY, for Plaintiff.

Alec W. Farr, Esq., Howard M. Rogatnick, Esq., Bryan Cave LLP, New York, NY, for Defendant.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

The Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass–Through Certificates, Series 1999 C–1 ("Trust") brings this action against Love Funding Corporation ("Love Funding") for breach of contract. The Trust's claim arises from Love Funding's breach of representations and warranties set forth in a Mortgage Loan and Purchase Agreement ("Love MLPA")[1] between Love Funding and Paine Webber Real Estate Securities, Inc. ("Paine Webber"), whose successor, UBS Paine Webber ("UBS"),[2] subsequently assigned its rights under the Love MLPA to the Trust. The Trust now seeks $18,004,175.37 in damages, reduced by a 5,916.515.17 million dollar offset, for a total of $12,087,660.20 including indemnification. In accordance

---

**1.** *See* Love MLPA, Ex. A to Affidavit of Howard Rogatnick, Counsel for Love Funding, In Support of Love Funding Motion for Summary Judgment.

**2.** In November 2000, Paine Webber's parent merged with UBS AG. *See* Joint Statement of Undisputed Facts ("JSUF") ¶ 10. Paragraph numbers refer to the parties' corrected and submitted version of the JSUF because the original contained a numbering discrepancy. For ease of reference, I refer to both entities throughout as "UBS."

with *Trust Remand*,[3] Love Funding's affirmative defense of champerty must fail. I therefore enter judgment in favor of the Trust and award the Trust $1,737,540.94 in damages.

## II. BACKGROUND

### A. The Parties

The Trust is a New York trust created pursuant to an agreement dated November 1, 1999, between Merrill Lynch [Click for Enhanced Coverage Linking Searches] Mortgage Investors, Inc. ("MLMI"), as Depositor; Orix Capital Markets, LLC ("Orix"), as Master and Special Servicer; and Norwest Bank Minnesota, N.A., as Trustee. Love Funding is "a full-service, commercial mortgage-banking firm" that "offers loan placement services for borrowers, and origination, consulting and servicing of loans for investors."[4]

### B. Procedural Posture

In *Trust I*,[5] I determined as a matter of law that Love Funding breached one of its warranties under Section 5.02(cc) of the Love MLPA.[6] A bench trial was held from January 17, 2007 to January 23, 2007 on the remaining issues of Love Funding's affirmative defense of champerty and on the amount of damages, if any, the Trust could recover from Love Funding. Following the trial, this Court held in *Trust II* that the assignment of UBS's claims under the Love MLPA to the Trust was void for champerty, and as such, the Trust was not entitled to any award of damages.[7]

On appeal, the Second Circuit certified three questions to the New York Court of Appeals regarding the nature and scope of champerty under New York law.[8] Pursuant to the response of the New York Court of Appeals,[9] the Second Circuit reversed *Trust II*, holding that the record could not support a finding of champerty under New York law. The Second Circuit remanded to this Court for entry of judgment in favor of the Trust and for a calculation of damages.[10]

### C. Undisputed Facts[11]

#### 1. 1999: Love MLPA and the Arlington Loan

On April 23, 1999, Love Funding entered into a conduit lending agreement

---

**3.** *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass–Through Certificates, Series 1999–C1 v. Love Funding Corp.*, 591 F.3d 116 (2d Cir. 2010) *("Trust Remand")*.

**4.** Love Funding Website, *About Love Funding*, http://lovefunding.com/about/index.php (last visited Aug. 13, 2010).

**5.** *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Pass–Through Certificates Series 1999–C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) *("Trust I")*.

**6.** *See id.*, at *7. I found Love Funding strictly liable for the breach. *See id.* As such, its knowledge of the breach—or undisputed lack thereof—is immaterial given the language of section 5.02(cc).

**7.** *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mort-* gage Pass–Through Certificates Series 1999–C1 v. Love Funding Corp., 499 F.Supp.2d 314, 325 (S.D.N.Y.2007) *("Trust II")*.

**8.** *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass–Through Certificates, Series 1999–C1 v. Love Funding Corp.*, 556 F.3d 100, 114 (2d Cir.2009) *("Trust Appeal")*.

**9.** *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass–Through Certificates, Series 1999–C1 v. Love Funding Corp.*, 13 N.Y.3d 190, 890 N.Y.S.2d 377, 918 N.E.2d 889 (2009) *("Trust Certification Resolution")*.

**10.** *See Trust Remand*, 591 F.3d 116.

**11.** The following facts are taken from the JSUF.

with UBS in which Love Funding identified and then originated mortgage loans using funding provided by UBS.[12] Love Funding subsequently assigned the loans to UBS and received a fee as consideration. Love Funding and UBS memorialized this relationship in the Love MLPA.[13] The Love MLPA included Love Funding's representations and warranties concerning the fitness of each of the loans assigned to UBS, a mutual notice obligation in the event of a breach of Love Funding's representations and warranties, a sequence of actions to be taken post-breach, and an indemnification provision requiring Love Funding to reimburse UBS for fees and costs associated with such a breach.[14]

On July 6, 1999, Love Funding made a 6.4 million dollar mortgage loan (the "Arlington Loan") to an entity known as Cyrus II Partnership ("Cyrus"). The Arlington Loan was evidenced by a promissory note (the "Note"), which, in turn, was secured by (1) a lien on a Cyrus property in Louisiana called Arlington Apartments (the "Mortgage"), and (2) a guaranty executed by Mondona Rafizadeh, a principal of Cyrus (the "Guaranty"). As per the terms of the Love MLPA, Love Funding assigned the Arlington Loan to UBS and received a fee of $64,000. Both Love Funding and UBS conducted initial due diligence on loans related to the Love MLPA.

On November 1, 1999, UBS and Merrill Lynch Investors, Inc. ("Merrill Lynch") entered into the Merrill Lynch Mortgage Investors Mortgage Loan Purchase Agreement ("MLMI MLPA"), which covered the sale of the Arlington Loan. The MLMI MLPA contained provisions similar to the Love MLPA. Specifically, UBS made several representations and warranties in the MLMI MLPA concerning the Arlington Loan. After purchasing the Arlington Loan from UBS, Merrill Lynch in turn assigned it to the Trust on November 1, 1999—the date of the MLMI MLPA.

### 2. 2002–2003: Discovery of Cyrus's Fraud and the Foreclosure Action

On March 8, 2002, the Trust notified Cyrus that the Arlington Loan had been declared in default and that the full amount of the loan would be accelerated.[15] On March 13, 2002, the Court for the Twenty–Fourth Judicial District for Jefferson Parish ("the Louisiana Court") issued an order to foreclose on the Arlington Apartments (the "Foreclosure Action").[16] By March 23, 2002, the Trust discovered certain facts indicating that Cyrus had committed fraud during the origination of the Arlington Loan.[17] Between April and August 2002, the Trust notified UBS of

---

12. The original lending agreement was between Love Funding and Paine Webber.

13. UBS drafted the Love MLPA and sent it to Love Funding. Karen Ford, Senior Vice President of Love Funding, signed on behalf of Love Funding after negotiations over certain terms. *See* JSUF ¶ 14.

14. Each of these provisions is discussed in detail below in the Applicable Law section.

15. Cyrus was current on all principal and interest payments. The Arlington Loan, however, was transferred to special servicing by Orix, which attempted unsuccessfully to inspect the property. *See* JSUF ¶¶ 40, 42, 49.

16. A related action in Texas was eventually consolidated along with this action in the

Louisiana courts. *See id.* ¶ 55. I will refer to the two actions collectively as the "Foreclosure Action."

17. The Louisiana Court found in its December 23, 2004 Reasons for Judgment that Cyrus had in fact committed fraud. *See Cyrus II P'ship v. ORIX Capital Mkts., LLC,* No. 578–417, slip op. at 13, 20 (Jefferson Parish Ct. Dec. 23, 2004) (attached to Jan. 11, 2005 Trust Letter in Support of Summary Judgment) ("The evidence of Cyrus's fraud was overwhelming.... But for Cyrus's fraud, [the Arlington Loan] would not have been made."). It is undisputed that Love Funding was unaware of Cyrus's fraud when it originated the Arlington Loan. *See* JSUF ¶ 71.

Cyrus's fraud and demanded that UBS repurchase the Arlington Loan. UBS chose to vigorously defend itself rather than cure or repurchase the loan.

In September and October 2002, the Trust instituted various lawsuits against UBS related to the sale of certain loans, including the Arlington Loan (the "MLMI Litigation"). Between June 7, 2002 and November 8, 2002, Love Funding received litigation requests related to the Foreclosure Action, and representatives of Love Funding were deposed. Love Funding was not named as a party in the MLMI Litigation, but provided third-party discovery.[18] On July 31, 2003, the Trust made a formal written demand on UBS that it uphold its obligation under the MLMI MLPA to cure breaches relating to the Arlington Loan or else repurchase. On October 29, 2003, UBS responded in writing to the demand and declined to cure or repurchase the loans.

### 3. 2004: Settlement of the MLMI Litigation, the Sale of the Arlington Apartments, the Filing of this Action, and the Assignment

On September 14, 2004, the Trust and UBS settled the MLMI Litigation ("the MLMI Settlement"). The Trust received 19.375 million dollars from UBS under the MLMI Settlement.[19] During this time, the Louisiana Court in the Foreclosure Action determined that Cyrus's fraud constituted an "Event of Default" under the terms of the Mortgage.[20] Pursuant to court order, on October 21, 2004, Cyrus sold the Ar-

lington Apartments for 6.7 million dollars (the "Sale Proceeds"), which were then placed in escrow.

Love Funding did not receive a demand to cure its breach or repurchase the Arlington Loan at any time before November 2004. On November 1, 2004, the Trust filed the Complaint against Love Funding in this Court. On November 3, 2004, the Trust sent Love Funding a formal, written demand that Love Funding cure its breach of the Love MLPA or repurchase the Arlington Loan. Love Funding refused the demand several days later. On November 15, 2004, the Complaint in this action was served on Love Funding. On November 18, 2004, UBS assigned its rights under the Love MLPA to the Trust (the "Assignment").[21]

### 4. 2005–2006: The Trust Receives a Portion of the Sale Proceeds and the Trust Obtains Limited Recovery from Cyrus

On May 5, 2005, the Trust received $5,912,150.78 from the Sale Proceeds. On March 31, 2006, the Trust received $4,364.39 from post-judgment collection efforts against Cyrus.

### III. APPLICABLE LAW

#### A. Love MLPA[22]

##### 1. Section 5.02(cc): Representations and Warranties Regarding Individual Mortgage Loans

. . . [A]s to each Mortgage Loan, [Love Funding] hereby makes the following

---

18. UBS impleaded another loan originator, Wexford BancGroup LLC, but chose not to implead Love Funding. *See Trust II*, 499 F.Supp.2d at 318, n. 6.

19. As the Trust's sole consideration for releasing UBS from its obligations under the Arlington Loan, UBS assigned to the Trust all of UBS's rights under the Love MLPA. *See* Trial Transcript ("Tr.") at 77, 92 (testimony of John Dinan, a Director of Distressed and Proprietary Assets at Orix).

20. *See Cyrus II P'ship*, No. 578–417, slip op. at 13.

21. Although the MLMI Settlement was reached as noted on September 14, 2004, the Assignment was not executed until November 18, 2004.

22. New York law governs the interpretation of the Love MLPA and determines the parties' rights and obligations thereunder. *See* Love MLPA § 9.05.

representations and warranties to [UBS] as of each related Closing Date:

(cc) There is no default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note.

## 2. Section 5.03: Remedies for Breach of Representations and Warranties

### a. Section 5.03(a) (Notice)

Upon discovery by either [Love Funding] or [UBS] of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of any or all of the Mortgage Loans ... the party discovering such Breach shall give prompt written notice to the other.

### b. Section 5.03(b) (Cure or Repurchase)

Within sixty (60) days of the earlier of either discovery by or notice to [Love Funding] of any Breach of a representation or warranty, [Love Funding] shall cure such Breach in all material respects and, if such breach cannot be cured, [Love Funding] shall, at [UBS]'s option, repurchase such Mortgage Loan at the Repurchase Price ....

### 3. Section 1.01:

### a. Definitions (Repurchase Price)

With respect to any Mortgage Loan, a price equal to (i) the Stated Principal Balance of the Mortgage Loan, plus (ii) interest on such Stated Principal Balance at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to [UBS] to the date of repurchase, minus (iii) amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in an account

maintained by [Love Funding] for the benefit of [UBS] for distribution in the month of repurchase.

### 4. Section 5.03(d) (Indemnification)

In addition to such repurchase obligation, [Love Funding] shall indemnify [UBS] and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a Breach of [Love Funding] representations and warranties contained in this Agreement or the related Purchase Price and Terms Letter. It is understood and agreed that the obligations of [Love Funding] set forth in this Section 5.03 to cure or repurchase a defective Mortgage Loan and to indemnify the Purchaser as provided in this Section 5.03 constitute the sole remedies of [UBS] respecting a Breach of the foregoing representations and warranties.

### B. The Note

[Cyrus] hereby agrees that upon the occurrence of an Event of Default or upon the failure of [Cyrus] to pay the Debt in full upon the Maturity Date, [Love Funding] shall be entitled to receive and [Cyrus] shall pay interest on the entire unpaid principal sum at the rate per annum equal to the greater of (1) 5% per annum above the Applicable Interest Rate or (ii) 5% per annum above the Base Rate ... in effect at the time of the occurrence of default (the "Default Rate").[23]

### C. Mitigation of Damages

 In *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*, the Second Circuit recently addressed the issue of mitiga-

---

**23.** Note, Ex. D to Declaration of Alex Farr, Counsel for Love Funding, at 3.

tion of damages.[24] "The injured party . . . bears an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery."[25] Even so, "it is not required that the injured party actually mitigate its damages."[26] Provided "plaintiff takes such [mitigating] action within the range of reason, the breaching party remains liable if such reasonable attempts at mitigation fail."[27]

■ "The standard of what reason requires of the injured party is lower than in other branches of law."[28] "Any such reasonableness inquiry would begin with the expectations of the parties as revealed by their contract."[29] A court must assess the steps taken by the non-breaching party to determine the reasonableness of the chosen course of action in light of the surrounding factual context.[30] In addition, a court must examine the actions of the breaching party when weighing facts in the reasonableness inquiry.[31] The breaching party is "not entitled simply to shift any expenses or costs . . . to [the non-breaching party]. If [the breaching party] had the same opportunity to avoid such costs, it had an obligation to do so."[32]

## IV. DISCUSSION [33]

### A. Mitigation

The Trust's claim for damages must be reviewed in light of whether UBS's decision to litigate with the Trust rather than repurchase the Arlington Loan from the Trust was reasonable under the circumstances, as well as whether the actions of Love Funding, the breaching party, were reasonable. For the following reasons I find—as I indicated in *Trust II*[34]—that

---

24. *See* 592 F.3d 108 (2d Cir.2010).

25. *Id.* at 111 (citing *Losei Realty Corp. v. City of N.Y.*, 254 N.Y. 41, 47, 171 N.E. 899 (1930)). *Accord Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985); *U.S. West Fin. Servs. v. Marine Midland Realty Credit Corp.*, 810 F.Supp. 1393, 1402 (S.D.N.Y.1993) ("[A]ny award of damages should be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them.") (quotation marks and citation omitted).

26. *APL*, 592 F.3d at 111.

27. *Id.* (citing *Ellerman Lines, Ltd. v. Steamship President Harding*, 288 F.2d 288, 290 (2d Cir.1961)) (quotation marks omitted).

28. *Id.* (citing *Ellerman*, 288 F.2d at 290).

29. *Id.*

30. *See id.* (noting the insufficiency of the district court's review where the court "failed to assess the missteps it found in [plaintiff's] efforts against the 'the range of reason' standard").

31. *See id.* at 112–13. ("In any event, no analysis of [plaintiff's] mitigation efforts, to be judged against the forgiving standard of reasonableness, could be complete without a commensurate analysis of [defendant's] post-breach conduct. Even if the trial court had otherwise properly assessed [plaintiff's] mitigation against the . . . standard of reasonableness, the failure to similarly assess [defendant's] conduct as part of that analysis was error.").

32. *Id.* at 112 (citing *Travelers Indem. Co. v. Maho Mach. Tool Co.*, 952 F.2d 26, 31 (2d Cir.1991)).

33. The Assignment transferred UBS's rights to damages and indemnification under the Love MLPA to the Trust in November of 2004. Accordingly, it is UBS's actions through November 2004 that I must review in assessing any award of damages to the Trust.

34. Though I declined to award damages in *Trust II* due to my finding of champerty, I included the following footnote:

> If I had not found the Assignment to be void, the Trust's damages would be limited to those incurred prior to September 30, 2002. In *Trust I*, I held that "to the extent that through its own delay [UBS] aggravated its injuries stemming from Love Funding's breach [of warranty] . . . the Trust's recovery should be reduced accordingly." Additionally, I held that UBS "could not accumulate default interest by remaining

UBS failed to mitigate the damages that the Trust, as its assignee, now seeks. I also find that the Trust's assertion that Love Funding acted unreasonably is unavailing.

### 1. UBS Failed to Mitigate Its Damages

■ That UBS failed to repurchase the Arlington Loan and instead invited the Trust to sue is central to the analysis of reasonableness. UBS's choices differed significantly from a simple decision between settling a claim for a certain but smaller financial loss and risking a potentially greater loss at trial. UBS had the option to repurchase the Arlington Loan from the Trust following the discovery of Cyrus's extensive fraud, thereby avoiding any liability to the Trust and incurring minimal or no fees. John Dinan, a Director of Distressed and Proprietary Assets at Orix, testified that a repurchase by

UBS would have ended UBS's liability to the Trust.[35] In its Reply, the Trust states that "[i]f Love Funding had informed UBS that it desired to repurchase the loan,[36] it is obvious that UBS would have accepted this offer—there would be no reason for it to decline, since it would have absolved UBS from all liability and cost it nothing."[37]

UBS chose instead to engage in costly litigation and the Trust is now bound by this choice as UBS's assignee. Seventy lawyers, ten separate law firms, and four courts[38] later, the MLMI ("scorched earth") Litigation was not a choice of greater or lesser loss. Rather, it was choice between costly and complex litigation or repurchasing the Arlington Loan and eliminating all of UBS's liability to the Trust through the eventual repurchase of that loan by Love Funding.

---

silent" upon learning of Love Funding's default. It is undisputed that UBS was on notice of Cyrus's fraud by August 2002 and that the MLMI Litigation commenced in September 2002. At that time, UBS could have mitigated its damages by either repurchasing the loan from the Trust and then demanding that Love Funding repurchase it, or impleading Love Funding as a third party defendant, as it did with Wexford Bancgroup LLC. In deciding to forego any of these remedies and instead to engage in protracted litigation over Arlington, LTBS failed to mitigate the damages it now seeks. Thus, any recovery to the Trust would be limited to those [damages] incurred through September 30, 2002, which total approximately $1,736,668.35. This is the repurchase price as of September 30, 2002, offset by the Trust's recovery from the borrower and proceeds from the sale of the Arlington property. It excludes indemnification to the Trust for costs incurred pursuing the borrower, as these expenses are disputed.
499 F.Supp.2d at 325, n. 79 (citations omitted).

**35.** *See* Dinan Deposition at 204:19–205:6, 251:3–17 (June 7, 2005), Ex. A to Love Funding Corrected Memorandum Concerning Fi-

nal Judgment ("Def. Mem."). *See also* Tr. at 258:8–19 (Dinan).

**36.** By the terms of the Love MLPA, it was UBS's responsibility—not Love Funding's—to timely request repurchase of the loan. *See* Love MLPA, section 5.03(b) ("if such breach cannot be cured, [Love Funding] shall, *at [UBS's] option*, repurchase such Mortgage Loan at the Repurchase Price") (emphasis added). While I held in *Trust I* that the language of the Love MLPA "does not make the exercise of this option in a timely manner a condition precedent to Love Funding's obligation to repurchase the loan," the Trust may not now contort the terms of the agreement to suggest that it was Love Funding's option to be exercised. 2005 WL 2582177, at *7.

**37.** Trust Reply Memorandum in Further Support of Its Position on Damages ("Reply Mem.") at 4.

**38.** As I noted in *Trust II*, the MLMI Litigation proceeded in one federal court, two Texas state courts, and New York state court and involved tens of millions of dollars in legal fees. *See* 499 F.Supp.2d at 318; JSUF ¶¶ 82–83.

The Trust argues vigorously that Love Funding cannot prove it could have or would have repurchased the Arlington Loan from UBS and that such evidence is required to support Love Funding's affirmative defense of failure to mitigate.[39] The Trust pursues this argument presumably to demonstrate that a repurchase by UBS without an assurance of repurchase by Love Funding would have been fruitless, and thus that UBS's choice to litigate was reasonable.

The Trust's argument fails. *First,* UBS never approached Love Funding with a repurchase demand although Love Funding provided third-party discovery in the MLMI Litigation and deposition testimony in related actions. Thus, due to its own inaction, UBS—and the Trust, as its assignee—cannot know whether Love Funding would have repurchased. *Second,* if Love Funding had refused the subsequent repurchase, as UBS suggests, UBS could then have argued that its own course of action in repurchasing was reasonable and that it had attempted to mitigate its damages. Instead, UBS chose litigation at the outset without approaching Love Funding and engaging in the first step of repurchasing the Arlington Loan under the MLMI MLPA.

This decision alone is sufficient to demonstrate a failure by UBS to take reasonable measures to mitigate its damages. But together with Love Funding's exclusion from the MLMI Litigation and the Arlington Loan's specific carve-out from the subsequent MLMI Settlement, UBS's failure to mitigate its damages is even more egregious. Despite Love Funding's position as the originator of the loan, UBS neglected to implead or otherwise directly involve Love Funding in the MLMI Litigation. Moreover, the MLMI Settlement provided a financial resolution for all loans in the package *except* the Arlington Loan. For the Arlington Loan only, UBS simply handed over its rights under the Love MLPA to the Trust—in essence, a ticket to sue—which necessarily entailed additional fees and costs. These additional actions illuminate the extent of UBS's failure to take reasonable steps to mitigate its damages.

I therefore find that UBS's decisions—to refuse to repurchase the Arlington Loan, to engage in litigation with the Trust, to exclude Love Funding from the MLMI Litigation, and to exclude the Arlington Loan from the MLMI Settlement—were unreasonable and as a result UBS failed to mitigate its damages Whether UBS knew that the MLMI Litigation would be long and costly is not the issue. Rather, UBS chose a course of action certain to incur significant fees while rejecting the option that would have entirely eliminated its liability to the Trust. The clarity of hindsight is unnecessary. The reasonable choice was as evident in 2002 as it is now.

### 2. Love Funding's Actions Were Reasonable

■ It is undisputed that Love Funding breached the Love MLPA. It is also undisputed that Love Funding did not provide the prompt written notice required under the Love MLPA despite its certain knowledge of Cyrus's fraud by September of 2002. The Trust also asserts that Love Funding did not perform even the most rudimentary investigation of its potential liability for the Arlington Loan, an omission the Trust argues is a failure to mitigate.[40]

Love Funding had a limited opportunity to mitigate the damages at issue. To the

---

39. *See* Trust Memorandum in Support of Its Position on Damages ("Pl. Mem.") at 10–13.

40. *See id.* at 13.

extent Love Funding's actions affected the damages now sought, its choices were reasonable. *First,* although failing to provide prompt written notice is a mutual breach by both Love Funding and UBS, no damages stem from Love Funding's failure. That Love Funding should have sent prompt written notice is clear; it is also self-evident that sending UBS, a party to the MLMI Litigation, notice of the very fraud on which the suit was based would have been redundant.

*Second,* Love Funding's decision not to act upon the Trust's initial estimate of liability for the Arlington Loan was reasonable. In *Trust II,* I credited the testimony of Karen Ford, Senior Vice President of Love Funding, who stated that the Trust had initially indicated during a phone call to Love Funding in 2004 that Love Funding would be liable in the amount of ten million dollars for the Arlington Loan.[41] Ford testified that this was approximately twice the total net value of Love Funding[42] and was, as I noted, an amount that "far exceeded the Trust's own previous calculation of its losses with respect to Arlington (approximately $3 million), as well as the $4 or $5 million the Trust had once been prepared to accept from UBS as compensation for releasing UBS from the Arlington Loan."[43]

As I noted in *Trust II,* "[n]o reasonable person, with knowledge of the posture of the loan in November 2004, would have expected Love Funding to pay millions of dollars in interest that had been accruing on the loan for years ...."[44] Moreover, given Love Funding's limited ability to mitigate damages and the Trust's excessive initial estimate of liability, Love Funding's actions following the breach were reasonable.[45]

## B. Damages

### 1. Repurchase Price

Under section 5.03(b) of the Love MLPA, Love Funding had the obligation to cure the breach caused by Cyrus's fraud, or, in the event that Love Funding could not cure, to repurchase the Arlington Loan at the Repurchase Price. The Repurchase Price equals the principal plus interest at the non-default rate of 8.05% from and after February 1, 2002 (non-default interest was paid by the borrower through this date) plus default interest at 5% per annum from the inception of the loan on July 7, 1999.[46]

In *Trust I,* I held that Love Funding was strictly liable for its breach.[47] Because Love Funding failed to cure or repurchase the Arlington Loan, Love Funding is liable to the Trust for damages in

---

41. *See Trust II,* 499 F.Supp.2d at 320–21; *see also* Tr. at 464 (Ford).

42. *See* Tr. at 464 (Ford).

43. *Trust II,* 499 F.Supp.2d at 320–21 (citations omitted); *see also* Tr. at 90 (Dinan).

44. *Id.* at 322.

45. The Trust claims that Love Funding had an equal opportunity to mitigate damages. *See* Pl. Mem. at 8–10; *see also APL,* 592 F.3d at 112 ("[A]s the breaching party, [defendant] was not entitled simply to shift any expenses or costs associated with the [breach] to [plaintiff]. If [defendant] had the same opportunity

to avoid such costs, it had an obligation to do so.") (citing *Travelers Indem. Co.,* 952 F.2d at 31) ("[T]he victim of a breach of contract need not make expenditures to mitigate damages where the breaching party had the same opportunity to prevent damages."). Love Funding had no opportunity to prevent the accrual of extensive interest, legal fees, and costs that UBS's refusal to repurchase caused.

46. *See* Pl. Mem. at 6; *see also* JSUF ¶ 56 (the Louisiana Court determined in the Foreclosure Action that under Louisiana law, default interest commenced on the Arlington Loan on July 7, 1999, the date of the loan origination).

47. *See Trust I,* 2005 WL 2582177, at *7.

the amount of the Repurchase Price.[48] The Trust calculates that as of May 13, 2010, the principal totaled $6,282,671.16, the interest totaled $4,248,342.24, and the default interest totaled $3,458,959.51 for a Repurchase Price of $13,989,972.91.[49]

■ However, interest on the Repurchase Price must be tolled based on UBS's own actions. As I noted in *Trust II*, UBS may not increase its damages by remaining silent after discovery of a breach.[50] LTBS indisputably knew of Cyrus's fraud by September 2002 when the MLMI Litigation commenced. Even so, UBS sent neither the required written notice nor a timely repurchase request to Love Funding.[51] Instead, UBS simply continued on with the extensive MLMI Litigation, never impleading Love Funding while interest and default interest accrued under the Love MLPA Repurchase Price calculations. As the commencement of the MLMI Litigation is incontrovertible evidence of UBS's awareness of Cyrus's fraud as of September 2002, the interest calculation on the Repurchase Price must cease after September 30, 2002.

The Trust states that the Repurchase Price as of September 30, 2002 totaled $7,654,056.11, representing $6,282,671.16 in principal, $339,979.77 in interest at 8.05% per annum, and $1,031,405.18 in default interest at 5% per annum.[52] Love Funding is therefore liable to the Trust, as UBS's assignee, for damages in the amount of $7,654,056.11 representing the Repurchase Price through September 30, 2002.

## 2. Indemnification

■ Under section 5.03(d) of the Love MLPA, Love Funding must indemnify the Trust for, inter alia, "any ... reasonable and necessary legal fees and related costs ... resulting from any claim, demand, defense or assertion based on ... or resulting from a Breach of [Love Funding] representations and warranties" in the Love MLPA. The Trust now seeks indemnification for legal fees and costs related to (1) the action against Cyrus ("the Borrower Litigation") in the amount of $2,392,978.89 through the date of trial, (2) a limited portion of UBS's expenditures (as the Trust's assignor) related to the Arlington Loan in the MLMI Litigation, stipulated to at trial as $268,231.02,[53] (3) this action through the end of trial in the amount of $514,415.08,[54] and (4) this action after trial, including the cost of the appeal to the Second Circuit, in the sum of $1,352,992.55.[55]

Under the "reasonable and necessary" language of section 5.03(d) of the Love MLPA, Love Funding is not liable for any

---

48. Love Funding argues that it did not own the loan in 2002 and therefore could not repurchase it unless it was first repurchased by UBS. *See* Def. Mem. at 11. As noted, Love Funding is strictly liable for the breach. Love Funding is therefore liable for the Repurchase Price in accordance with section 5.03(b) of the Love MLPA.

49. *See* Spreadsheet of Damages Calculation, Ex. A to Pl. Mem.

50. *See Trust II*, 499 F.Supp.2d at 325, n. 79.

51. *See* JSUF ¶ 76 ("Neither UBS nor the Trust made any demand on Love Funding that it

cure or repurchase the Arlington Loan under the Love MLPA between 2002 and October 2004.").

52. *See* Spreadsheet of Damages Calculation through September 30, 2002, Ex. B to Pl. Mem.

53. *See* Pl. Mem. at 7; *see also* Spreadsheet of Damages Calculation, Ex. A to Pl. Mem.

54. *See* Pl. Mem. at 6; *see also* Spreadsheet of Damages Calculation, Ex. A to Pl. Mem.

55. *See* Spreadsheet of Damages Calculation, Ex. A to Pl. Mem.

fees and expenses incurred by the Trust. *First*, the millions of dollars the Trust has spent attempting to recover from Cyrus and related parties would not have been incurred had UBS reasonably mitigated its damages and repurchased the Arlington Loan. *Second*, the legal fees and costs UBS expended in the MLMI Litigation—a forum in which Love Funding's involvement could have been addressed had it not been excluded—should not now be placed on Love Funding's shoulders.[56]

*Third*, Love Funding is not liable for the millions of dollars in legal fees and costs the Trust has expended in pursuing Love Funding. The Trust now stands in UBS's shoes as its assignee and is thus bound by UBS's decisions prior to the Assignment. The fees and costs the Trust claims that it incurred in this action would not exist save for UBS's unreasonable decision to refuse to repurchase. Furthermore, the Arlington Loan was purposely left out of the MLMI Settlement in favor of the Trust obtaining the rights to accrue fees by suing Love Funding in this action. Therefore, the fees and costs incurred in this action are neither reasonable nor necessary under the Love MLPA.

## C. Credits and Reductions
### 1. Sale Proceeds

The Trust concedes that Love Funding is entitled to a credit of $5,916,515.17 representing the funds already received by the Trust from the Sale Proceeds and from Cyrus.[57] Love Funding now argues that Orix, "on behalf of the Trust," holds a perfected first priority lien against 6.9 million dollars in Sale Proceeds placed in an escrow account.[58] Based on documents from the Texas bankruptcy court, Love Funding further asserts that Orix (1) received the entirety of the Sale Proceeds, (2) voluntarily paid one million dollars of the received Sale Proceeds to settle administrative and general unsecured claims, and (3) received in return the right to pursue single-business enterprise ("SBE") litigation and to receive a distribution of the remaining 5.9 million dollars.[59]

The Trust counters that the funds from the Sale Proceeds became the property of the borrower's bankruptcy estate in 2005.[60] The Trust further claims that its attempt to secure a release of all net Sales Proceeds was unsuccessful because the bankruptcy trustee contested the claim and refused to release the entirety of the full Sales Proceeds.[61] The Trust claims that as part of a settlement with the bankruptcy trustee, the Trust received only the previously-stipulated amount of $5,912,150.78.[62]

---

**56.** In *Trust II*, I stated that Love Funding cannot be expected to pay "for expenses UBS incurred as a result of the MLMI Litigation, in which Love Funding was never involved." 499 F.Supp.2d at 322.

**57.** *See* Pl. Mem. at 8; *see also* JSUF ¶¶ 68–69 (the $5,916,515.17 credit includes the stipulated $5,912,150.78 Sale Proceeds and the $4,364.39 sum already recovered from Cyrus).

**58.** Def. Mem. at 21. The initial amount placed in escrow totaled 6.5 million dollars. *See id.* At the time of transfer to a separate escrow account held by the bankruptcy trustee, the Sale Proceeds totaled $6,909,986.88. *See id.; see also* Notice of Final Transfer of Funds to Trustee and Compliance with Orders, United States Bankruptcy Court for the Southern District of Texas, Houston Division (October 4, 2005) ("Bankruptcy Transfer"), Ex. E to Def. Mem.

**59.** *See* Def. Mem. at 21–23; *see also* Third Amended Settlement Agreement, March 29, 2006, Ex. F to Def. Mem.

**60.** *See* Pl. Mem. at 22. *See also* Tr. at 144–149 (Dinan); Dinan Deposition, at 12–15 (April 27, 2006), Ex. C to Def. Mem.

**61.** *See* Pl. Mem. at 22; *see also* Tr. at 144–149 (Dinan).

**62.** *See* Pl. Mem. at 22; *see also* June 7, 2010 Affidavit of John Dinan ("Dinan Aff.") ¶ 2.

Love Funding is not entitled to the additional one million dollar credit it now seeks. *First,* Love Funding stipulated to the amount of $5,912,150.78 at trial, presumably after reviewing the information available both publicly and through the production of the Trust. Love Funding may not now, at this post-trial date, "realize" that publicly-available documents might counter the beliefs Love Funding held when it stipulated to the $5,912,150.78 amount. *Second,* Love Funding's contention that the actions of Orix were also those of the Trust are undermined by the Trust's unsuccessful attempt to secure for itself a release of the entire 6.9 million dollars to which Orix was allegedly entitled. The Trust has repeatedly represented that the Bankruptcy Court refused to order a distribution of the entire proceeds to the Trust.[63] As such, Love Funding's credit for the sale of the property remains the $5,912,150.78 stipulated to at trial.[64]

## 2. Recovery from Cyrus and Rafizadeh (Borrower and Guarantor)

The Trust has already recovered $4,364.39 from Cyrus.[65] Love Funding contends that the Trust "has recovered or stands to recover" millions of dollars more as a result of a March 2009 settlement approved by the Texas bankruptcy court.[66] The March 2009 Bankruptcy Agreement provides that the "Orix Parties' remaining unsecured claim against the Estates shall be allowed in the amount of $8,676,933.46."[67]

Love Funding asserts that any funds recovered from the original debtors—including the proceeds from the March 2009 Bankruptcy Agreement that remain after payment of the bankruptcy estate's expenses—should be subtracted from any award of damages.[68] I agree. The damages I award to the Trust represent the total amount that it is owed with respect to the Arlington Loan. Any further recovery would result in a double recovery.[69] Thus, the $4,364.39 the Trust already recovered from Cyrus and any future distributions from the March 2009 Bankruptcy Agreement or from any borrower must be credited to Love Funding.[70]

63. *See* Pl. Mem. at 22; *see also* Reply Mem. at 10; Bankruptcy Transfer, Ex. E to Def. Mem.; Dinan Aff. ¶ 6; Excerpt of Dinan Deposition, at 17–19 (Apr. 27, 2006), Ex. A to Dinan Aff.; Tr. at 144–145 (Dinan).

64. As the Trust was a claimant in the bankruptcy case and was not itself a bankrupt entity, it received no benefit from Orix's application of the one million dollars to pay unsecured creditors of the bankrupt entities.

65. *See* JSUF ¶ 69.

66. Def. Mem. at 23; *see also* Order Approving Motion of Chapter 7 Trustee for Approval of Settlement Agreement in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("March 2009 Bankruptcy Agreement"), Ex. I to Def. Mem.

67. March 2009 Bankruptcy Agreement at 3 ¶ 4, Ex. I to Def. Mem. The term "ORIX Parties" is not defined in the March 2009 Bankruptcy Agreement but the Trust does not contest its inclusion in this term.

68. *See* Def. Mem. at 23–24.

69. In light of the bankruptcy proceedings, Love Funding requests limited discovery into any additional funds received by the Trust to prevent the Trust from obtaining a "double recovery." *See id.* at 23. As the record is sufficient, and as I have addressed this point above, Love Funding's request is denied.

70. *See Trust II,* 499 F.Supp.2d at 325, n. 79 (indicating that recovery from the borrower should be credited against any damages recovered by the Trust). The Trust argues that due to the deceptive conduct of Cyrus and the other debtors, efforts to obtain a recovery have cost the Trust over 2.4 million dollars. *See* Dinan Aff. ¶ 13; *see also* Reply Mem. at 12. The Trust claims it has since spent "many millions of dollars more" in its efforts to seize assets, pursue litigation, and defend the Trust against counter-suits. Dinan Aff. ¶ 13. Dinan states in his most recent affidavit that the Trust has as yet received no funds from the March 2009 settlement and that he

### 3. Summary

In sum, the Trust is not entitled to indemnification for any costs of this action, for the Borrower Litigation, or for costs and fees related to the MLMI Litigation. The Trust is also not entitled to interest beyond September 30, 2002 that stems from Love Funding's breach. The Trust is entitled to receive the Repurchase Price in the amount of $7,654,056.11, reduced by the $5,912,150.78 Sale Proceeds and the $4,364.39 already recovered from Cyrus for a total damage award of $1,737,540.94.

### D. MLMI Settlement

The Trust received 19.375 million dollars under the MLMI Settlement to resolve the MLMI Litigation,[71] but the Arlington Loan was excluded. Instead, as to the Arlington Loan, the Trust received only UBS's rights against Love Funding under the Love MLPA.[72] In *Trust II,* I held that it was "simply not credible" that "[i]n calculating the damages it seeks from Love Funding, the Trust contends that not a penny of its Settlement with UBS should be allocated to the Arlington Loan." [73]

However, even if UBS had allocated a portion of the MLMI Settlement to the Arlington Loan, UBS would have paid those funds to the Trust and thus would have had the right to seek recovery of those funds from Love Funding under the Love MLPA. As argued by the Trust, this would now merely represent an additional category of damages that the Trust, standing in the shoes of UBS, could seek to recover against Love Funding.[74] As a result, the amount of any allocation is essentially irrelevant. Whatever that allocation might have been, it would be recoverable from Love Funding. For that reason, no reduction in the damages to be paid by Love Funding is warranted as a result of the MLMI Settlement. The Trust's damages award remains fixed at $1,737,540.94.

## V. CONCLUSION

For the reasons stated herein, judgment is entered in favor of the Trust in the amount of $1,737,540.94. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

expects the Trust's expenditures to outweigh any future distribution from the settlement, resulting in a zero net gain for the Trust. *See id.* ¶¶ 15–16. That the Trust expended more in its efforts to recover than the likely recovery itself should not preclude Love Funding from receiving a credit for the amount the Trust receives from Cyrus.

**71.** *See* JSUF ¶ 84.

**72.** *See* Tr. at 150:22–152:13 (Dinan).

**73.** 499 F.Supp.2d at 325.

**74.** *See* Reply Mem. at 13; *see also* Tr. at 151:4–13 (Dinan) ("[T]he [T]rust's position . . . is that it really would be irrelevant, even if you did allocate some of those funds to Love Funding. . . . If UBS had . . . or the [T]rust had agreed to specifically allocate some of the $20 million to Arlington damages, those . . . damages would fall under the rights for recovery under the indemnification of damages under the Love Funding MLPA [resulting in] a net zero effect to Love Funding.").