08-1516-cv
*APL Co. PTE Ltd. and American President Lines, Ltd. v. Blue Water Shipping U.S., Inc., Blue Water Shipping A/S, Cousins D. & N., Inc., Astra Group, Inc., and Akata Food Trading, Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: April 17, 2009)                              (Decided: January 8, 2010)

Docket No. 08-1516-cv

————————————————————————

APL CO. PTE LTD. and AMERICAN PRESIDENT LINES, LTD.,

*Plaintiffs-Appellant*s,

-v.-

BLUE WATER SHIPPING U.S. INC.,

*Defendant-Cross-Claimant-Appellee*,

BLUE WATER SHIPPING A/S,

*Defendant*,

COUSINS D. & N., INC. ASTRA GROUP, INC., and AKATA FOOD TRADING, INC.

*Defendants-Cross-Defendants*.

————————————————————————

Before:        SACK, LIVINGSTON, *Circuit Judges*, and VITALIANO[*], *District Judge*.

---

[*] The Honorable Eric N. Vitaliano, of the Eastern District of New York, sitting by designation.

1

_____

Plaintiff-appellants APL Co. PTE Ltd. and American President Lines, Ltd. (collectively "APL") appeal from a final judgment entered in the United States District Court for the Southern District of New York (*Eaton*, M.J.), to the extent that it reduces the damages awarded against defendant-cross-claimant-appellee Blue Water Shipping U.S. Inc. ("Blue Water") for breach of contract because APL had failed to mitigate its damages. We now vacate the judgment in part and remand the case to the district court for further proceedings consistent with this opinion.

_____

JAMES H. HOCHENSTEIN and LISSA D. SCHAUPP, Holland & Knight, LLP, New York, NY, *for Plaintiffs-Appellants*.

DAVID K. MONROE, Galland, Kharasch, Greenberg, Fellman & Swirsky, P.C., Washington D.C., SANDRA GALE BEHRLE, Cooper, Brown & Behrle, New York, N.Y. *for Defendants-Cross-Claimant-Appellee*.

ERIC N. VITALIANO, *District Judge*:

## BACKGROUND

This case arises out of a maritime contract. At issue are expenses related to cargo shipped as agreed but left uncollected by its owner at the dock. More precisely, 29 refrigerated containers ("reefers") of imported garlic were landed and ultimately left to rot in APL's warehouse on a Los Angeles, California wharf. That Blue Water bore responsibility for the uncollected garlic is not controverted. All that is before us on this appeal is whether the district court properly found that

APL had failed to reasonably mitigate the loss caused by Blue Water's breach and that the corresponding reduction in the amount of damages awarded was appropriate.

The salient facts are essentially undisputed. APL was retained to ship the 29 reefers of garlic to the port of Los Angeles, where the garlic was to be picked up by Blue Water and delivered to its ultimate purchaser, Akata Food Trading Company ("Akata"). APL unloaded successive shipments of the garlic onto its dock between March 31 and April 22, 2003. Upon delivery, APL notified Blue Water that the garlic was ready for Blue Water's transshipment to Akata. Meanwhile, in addition to a number of holds placed by other federal agencies, United States Customs and Border Protection ("Customs") levied anti-dumping tariffs on the cargo.

In the end, Blue Water never came to collect the garlic, which passed into the "constructive General Order" custody of Customs ("constructive G.O."), a constructive custody because the cargo physically remained in APL's terminal occupying 29 of its reefers. Critically, APL's bill of lading stated the agreement of the parties that once the garlic passed to Customs' control, APL's contractual obligations ceased. As the district court found, Blue Water, not APL, was responsible for resolving all cargo holds, including the ones placed by Customs, and for paying the "demurrage"[1] charges that were to accrue until the garlic was off-loaded from APL's reefers.

APL and Blue Water employees communicated about physical collection of the cargo, including a plea by Blue Water on April 21st for a "few more days" while Blue Water and Akata attempted to resolve holds affecting the reefers that had arrived first. Then came a pivotal

---

[1] The district court found that the daily demurrage charge was a fee intended only to "cover" the cost of the upkeep of the reefers while they held the garlic, not for any lost profits suffered as a result of their unavailability.

3

exchange of e-mails on May 7th in which APL informed Blue Water that approximately $75,000 in demurrage had accrued on 26 of the reefers. Surmising that the demurrage now likely exceeded the value of the garlic, APL asked Blue Water if there was "any reason that [Akata] will even pick it up if it not worth it to them"—an idea with which Blue Water stated in reply it "agree[d]". Nonetheless, Blue Water pressed for more time to resolve the dilemma with Akata. But, Blue Water's request was rebuffed by APL, which declared that the garlic had to be collected by May 9th or be sent to auction.

Though the ultimatum went unanswered, APL did not immediately seek to auction off the garlic. Appellant explains that it was then still unaware of all of the regulatory requirements relating to such an auction. Soon thereafter it came to believe–erroneously, it now concedes– that Customs regulations mandated that the cargo remain at the terminal for six months and that Blue Water file a "letter of abandonment" as a prerequisite to disposal.

Indeed, appellant claims, it was not until May 19th, when one of its employees suggested the idea internally, that APL contacted Customs directly about the stalemate. It was that contact, APL professes, which led it to its erroneous conclusion that the garlic would have to remain in the reefers at the terminal for six months. Two days later, APL again spoke with the same Customs inspector and, again, APL came away with the same mistaken impression. Believing that it had nothing to lose, APL says, it then reached up the chain of command. After a flurry of phone calls between APL and a Customs supervisor, on June 5th, APL finally learned that there was no such six-month hold requirement and that a "quick sale" by auction, to be arranged through Customs, was the proper procedure to deal with cargo in constructive G.O. In the meantime, Blue Water was largely absent from the scene, although it did reappear to send a

4

"letter of subrogation" to APL on May 22nd and, on May 27th, to advise APL to auction the garlic "ASAP".

Working toward an auction, APL was informed by Customs, on June 11th, of another requirement–that a FDA inspection of the garlic was neeeded before it could be sold. At the same time, Customs also directed APL to contact the bonded Crescent Warehouse Company ("Crescent") to handle the quick sale. APL faxed a request to Crescent asking it to complete any necessary paperwork that same day. Initially balking, Crescent did not finish its processing until June 23rd. Crescent's reluctant efforts on behalf of APL proved, however, to be of no moment. Although an APL survey done on May 23rd determined otherwise, a series of FDA inspections and testings, ultimately completed on July 11th, found the garlic unfit for sale. After further delay, some occasioned by acts or omissions of Crescent, the last of the garlic on APL's dock was destroyed, but not until August 25th, nearly five months after arriving at the port of Los Angeles.

Trying its contract claims to the bench, APL sought $474,072.18 in damages, including $402,700 in demurrage charges. The district court found Blue Water liable in contract but also concluded that APL had failed to reasonably mitigate its damages and entered judgment for APL in the amount of $184,910.00. It is from that judgment APL now appeals.

**DISCUSSION**

On an appeal taken from a judgment entered following a bench trial, "we review the [d]istrict [c]ourt's findings of fact for clear error, but we review *de novo* its conclusions of law

and its resolution of mixed questions of fact and law." MacWade v. Kelly, 460 F.3d 260, 267 (2d Cir. 2006).

Without sketching the parameters of Blue Water's breach,[2] the district court moved swiftly to APL's mitigation efforts. It faulted APL for three delays in disposing of the garlic. First, "APL unreasonably delayed from May 9 to May 19, 2003 in failing to ask [Crescent] and U.S. Customs to authorize a quick sale." APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc., No. 05 Civ. 3454(DFE), 2008 WL 539927, ¶ 101 (S.D.N.Y. Feb. 28, 2008). Second, "APL unreasonably delayed from May 9 to June 11 before asking [Crescent] to fill out the necessary forms and submit them to Customs." Id. Finally, "[p]articularly after June 5, APL failed to pressure [Crescent] and Customs." Id. Had APL acted reasonably in these instances, the trial court decided, Customs and Crescent would have "likely" completed a quick sale by May 30th. Id. ¶ 102. Based on APL's May 23rd cargo survey, the court inferred that the garlic would still have been saleable by this date. However, the court also acknowledged the possibility that the quick sale may still have been delayed beyond May 30th, inevitably rendering some of the garlic rotten. The district court resolved this tension by holding that Blue Water was not liable, as the contract otherwise obligated it, for either the demurrage charges that accrued after June 7th or for the eventual costs of disposal.

While the parties stake out broad (and novel) positions, this appeal turns on application of well-settled principles of contract law.[3] It is elementary that a party injured by a breach is

_____

[2] In fact, the district court's finding of a contractual breach is only implicit. On remand, the trial court should more clearly define the nature and circumstances of Blue Water's breach.

[3] Despite the international flavor of their dispute, all sides agree that New York contract law governs.

6

entitled to recover damages that are the "natural and probable consequence of the breach." Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 192, 856 N.Y.S.2d 505, 508, 886 N.E.2d 127, 130 (2008) (internal quotation marks and citation omitted). The injured party, however, bears an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery. See Losei Realty Corp. v. City of N.Y., 254 N.Y. 41, 47, 171 N.E. 899, 902 (1930). Nonetheless, as the district court correctly reasoned, it is not required that the injured party *actually* mitigate its damages. Rather, "if plaintiff takes such [mitigating] action within the range of reason," the breaching party remains liable if such reasonable attempts at mitigation fail. Ellerman Lines, Ltd. v. The Steamship President Harding, 288 F.2d 288, 290 (2d Cir. 1961). Furthermore, "[t]he standard of what reason requires of the injured party is lower than in other branches of law." Id.

It is on this point that the trial court's analysis falters. Although it properly noted Ellerman required only that APL's mitigation efforts be within the "range of reason" to be effective, the court failed to assess the missteps it found in these efforts against the "the range of reason" standard. Specifically, for example, the trial court found unreasonable delay in mitigation resulting from APL's mistaken understanding of the Customs requirements for a quick sale. Factually, it is beyond challenge that APL was mistaken in its belief that the garlic had to stay on the dock for six months and be abandoned in writing by Blue Water before the cargo could be disposed. It is equally clear that APL's misapprehension of the Customs rules and regulations delayed resort to a quick sale and prolonged the use of its reefers after the garlic had been abandoned by Blue Water and Akata. But, the fact that APL could have been *more* effective in its efforts to arrange a quick sale that would have mitigated its damages does not end

7

the inquiry. It merely provides texture for examination of the reasonableness of APL's mitigation efforts—an examination the district court failed to perform.

Any such reasonableness inquiry would begin with the expectations of the parties as revealed by their contract. See generally Williams v. Montgomery, 148 N.Y. 519, 527, 43 N.E. 57, 59 (1896). In that light, all of the faults and missteps the trial court assigns to APL came after APL had fully completed its performance. That the missteps happened is not denied; missing is an analysis of these shortcomings against the more forgiving standard accorded a party that has fully performed all of its contract obligations and is thrust into the shoes of the breaching party as it scrambles to mitigate the impact of the breach.[4] The trial court's obligation was to determine whether the mitigation efforts actually chosen in those unaccustomed shoes were reasonable, not whether hindsight suggests that an objectively better choice was available. Ellerman, 288 F.2d at 290.

Also absent almost entirely are any factual findings or assessment by the district court of the acts and omissions of another crucial player—Blue Water. Of the two contesting parties, Blue Water had the greater financial interest in securing the retrieval or disposal of the rotting garlic from APL's wharf for it had contractually agreed to pay the demurrage charges while the cargo remained stored in APL's reefers. Indeed, one of the few findings the district court did make on this score was its determination that the resolution of holds placed on the garlic by

---

[4] This is especially so considering the trial court's finding that APL had failed to reasonably mitigate because it did not pester Customs more than it did to induce Customs to perform its governmental duties. To suggest that an injured party should have damages caused by another's breach reduced because the injured party failed to incessantly push a government agency to do its job more expeditiously is a highly dubious proposition.

Customs fell to Blue Water rather than to APL. APL Co. PTE Ltd., 2008 WL 539927, ¶ 53. Further, even though the record does indicate that Blue Water purported to have some contact with Customs on its own, there are no findings by the trial court whatsoever as to the role, if any, Blue Water had, or should have had, in the disposal process. Certainly, if APL assumed a role more customarily played by Blue Water, as a non-vessel operating common carrier, such a finding could well explain and cast as reasonable APL's unfamiliarity with the quick sale requirements. Moreover, as the breaching party, Blue Water was not entitled simply to shift any expenses or costs associated with the cargo disposal delay to APL. If Blue Water had the same opportunity to avoid such costs, it had an obligation to do so. See Travelers Indem. Co. v. Maho Mach. Tool Co., 952 F.2d 26, 31 (2d Cir. 1991) ("[T]he victim of a breach of contract need not make expenditures to mitigate damages where the breaching party had the same opportunity to prevent damages."). Finally, Blue Water's own knowledge of Customs rules and regulations and its post-breach conduct perhaps provide a yardstick by which to measure the reasonableness of APL's mitigation efforts. For example, Blue Water itself did not direct APL to auction the garlic until May 27th—18 days after the trial court found that APL should have known to request a quick sale through Customs. The circumstances that led Blue Water, an apparently sophisticated player in the industry, to dither about requesting an auction sale could shed some light on the reasonableness of the delays the trial court charged to APL. In any event, no analysis of APL's mitigation efforts, to be judged against the forgiving standard of reasonableness, could be complete without a commensurate analysis of Blue Water's post-breach conduct. Even if the trial court had otherwise properly assessed APL's mitigation against the Ellerman standard of

9

reasonableness, the failure to similarly assess Blue Water's conduct as part of that analysis was error.

## CONCLUSION

For all the foregoing reasons, we vacate that portion of the final judgment entered below that reduced the amount of damages awarded appellant for failure to mitigate its loss and remand this matter to the district court for further proceedings consistent with this opinion.