**APL CO. PTE. LTD. and American; President Lines, Ltd., Plaintiffs,**

v.

**BLUE WATER SHIPPING U.S. INC., Defendant.**

**No. 05 Civ. 3454(JLC).**

United States District Court, S.D. New York.

April 22, 2011.

James H. Hohenstein, Wayne Allen Parker, Haight, Gardner, Holland & Knight, LLP, New York, NY, for Plaintiffs.

David K. Monroe, Galland, Kharasch, Greenberg, Fellman & Swirsky, P.C., Washington, DC, for Defendant.

*MEMORANDUM AND ORDER*

JAMES L. COTT, United States Magistrate Judge.

This admiralty action, which arises out of the breach of an agreement between plaintiffs APL Co. Pte. Ltd. and American President Lines, Ltd. (together "APL") and defendant Blue Water Shipping U.S. Inc. ("Blue Water") concerning the transport of fresh garlic containers, is before the Court on remand from the United States Court of Appeals for the Second Circuit. On February 28, 2008, after a bench trial, Magistrate Judge Douglas F. Eaton found Blue Water liable in contract but concluded that APL failed to mitigate its damages reasonably and accordingly awarded APL damages in the amount of $184,910.00—substantially less than the $474,072.18 in damages APL had originally sought. By decision dated January 8, 2010, the Second Circuit vacated the portion of the judgment that reduced the amount of damages awarded to APL for failure to mitigate its loss and remanded the action for a re-assessment of the reasonableness of APL's mitigation efforts.

For the reasons set forth below, I conclude that APL's mitigation efforts were within the range of reason and award APL additional damages of $288,337.18 plus pre-judgment interest to be calculated by the Clerk of the Court as set forth in Part II.E. *infra.*

## I. BACKGROUND

The factual background to this action is set out more fully in Judge Eaton's February 28, 2008 decision, *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.,* No. 05 Civ. 3454(DFE), 2008 WL 539927 (S.D.N.Y. Feb. 28, 2008) (hereinafter "*APL I*"), and the Second Circuit's January 8, 2010 decision, *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.,* 592 F.3d 108 (2d Cir.2010) (hereinafter "*APL II*"), familiarity with which is assumed. The Circuit did not disturb the factual findings in *APL I,* and accordingly the Court incorporates them here. *See In re M/V DG Harmony,* No. 98 Civ. 8394(DC), 2009 WL 3170301, at *1 (S.D.N.Y. Sept. 30, 2009) (incorporating factual findings of first opinion on remand where findings undisturbed by Second Circuit); *BrandAid Mktg. Corp. v. Biss,* No. 03 Civ. 5088(WHP), 2008 WL 190494, at *1 (S.D.N.Y. Jan. 22, 2008) (same). The following constitutes the Court's additional findings of fact and conclusions of law pursuant Fed.R.Civ.P. 52(a), with certain prior findings and conclusions repeated for context.

## A. Factual Background

### 1. The Garlic Shipments

In March and April 2003, APL served as the ocean carrier for 29 refrigerated containers ("reefers") of fresh garlic that were shipped from China to the United States in four separate shipments. *APL I*, 2008 WL 539927, at *11 ¶¶ 45–46. Blue Water was the non-vessel operating common carrier (the "NVOCC") with respect to the shipments, and Akata Food Trading, Inc. ("Akata") was its ultimate consignee. *Id.* at *12 ¶¶ 47–48.[1] Both a House bill of lading ("HBL") and a Master bill of lading ("MBL") were generated for each shipment of garlic. *Id.* ¶ 49. Every HBL—which was issued by Blue Water and governed its relationship with Akata—listed Akata as the Consignee and Notify Party. *Id.* Every MBL—which was issued by APL and governed its relationship with Blue Water—listed Blue Water as the Consignee and Notify Party. *Id.* ¶ 50.[2]

The standard terms and conditions of each of the MBLs provide, in relevant part, as follows:

> The Merchant shall comply with all regulations or requirements of customs, port and other authorities, and shall bear and pay all duties, taxes, fines, imposts, expenses or losses. . . .

> All charges due hereunder together with Freight . . . shall be due from and payable on demand by the Merchant (who shall be jointly and severally liable to the Carrier therefore) at such port or place as the Carrier may require, Vessel or cargo lost or not lost from any cause whatsoever. . . .

> If the delivery of the Goods is not taken by the Merchant when and where the Carrier is entitled to call upon the Merchant to take delivery thereof, the Carrier shall be entitled . . . to . . . store the Goods . . . and the costs of such storage . . . shall forthwith upon demand be paid by the Merchant to the Carrier. . . .

> If the Merchant fails to take delivery of the Goods . . . or if in the opinion of the Carrier they are likely to deteriorate, decay, become worthless or incur charges . . . , the Carrier may . . . at the sole risk and expense of the Merchant, sell, destroy or dispose of the Goods. . . .

*Id.* at *1 ¶ 4 (citing MBL terms and conditions Clauses 13(iii), 14(iii), 21(iv)). The MBLs also define the term "Merchant" as including:

> the Shipper, Consignee, Receiver, Holder of the Bill of Lading, Owner of the cargo or Person entitled to the possession of the cargo or having a present or future interest in the Goods and the servants and agents of any of these, all of whom shall be jointly and severally liable to the Carrier for the payment of all Freight, and for the performance of the obligations of any of them under this Bill of Lading.

*Id.* (citing MBL terms and conditions Clause 1).

The four shipments of garlic arrived in California on March 31, 2003, April 1, 2003, April 16, 2003, and April 22, 2003, respectively. *Id.* at *12 ¶ 51. After the garlic shipments arrived in the United States, the United States Customs and Border Protection Agency ("Customs") assessed Anti–Dumping Duties of 376.76% of the

---

1. A NVOCC is defined by statute as "a common carrier that—(A) does not operate the vessels by which the ocean transportation is provided, (B) and is a shipper in its relationship with an ocean common carrier." 46 U.S.C. § 40102(16).

2. One MBL listed the Consignee and Notify Party as "Akata Food Trading Inc. on behalf of Blue Water Shipping U.S., Inc." *Id.*

value of the garlic—duties that the consignee, Akata, would have had to pay in order to claim the garlic. *Id.* ¶ 53. Akata did not claim the garlic, and, accordingly, demurrage charges began to accrue. *Id.* ¶ 52. Demurrage "is intended to cover the fixed costs incurred by the terminal (APL) for upkeep of the containers, including monitoring, maintenance and electricity costs." *Id.* Demurrage was charged at the rate of $100 per container per day for the first four days and $120 per container per day thereafter. *Id.* at *18 ¶ 76.

**2. The Transfer into General Order**

After the garlic shipments failed to clear Customs within 15 days from the date of each of the four vessels' arrival into the United States, APL's Customs Compliance Clerk, Mark Porter, began the General Order ("G.O.") process. *Id.* at *13 ¶ 55. "Once in G.O., the cargo is under the custody and control of U.S. Customs. If the G.O. merchandise is perishable, the customs regulations provide that it can be auctioned by a quick sale." *Id.* at *18 ¶ 78 (internal citations omitted).[3] Under a quick sale procedure, perishable cargo that has been inspected by the appropriate governmental agency—for example, the FDA or the USDA—and determined to be "saleable," can be sold in a public sale. *Id.* at *19 ¶ 79. If the goods are saleable, then the G.O. Warehouse prepares the CF 5251

form, which notifies the involved parties that the goods are scheduled for sale or destruction on a specific date. *Id.* ¶ 79. After the involved parties receive the notice, there is a three day public notice of sale and EG & G, the company under contract with Customs to dispose of all goods under Customs' jurisdiction and control, carries out the sale. *Id.* ¶ 79.

Beginning in late April 2003, Mr. Porter sent certain required G.O. notifications to Customs and to Crescent Warehouse Company, Ltd. ("Crescent"), a G.O. warehouse, along with a letter requesting a constructive G.O. number. *Id.* at *13 ¶ 55. He made this request because the containers contained fresh garlic requiring refrigeration and no G.O. warehouse in the area had cold storage. *Id.* ¶ 55. In response to this request, Customs placed the cargo in constructive G.O., and the garlic remained in APL's reefers and under Customs' control. *Id.* ¶ 56.

**3. Communications Between
APL and Blue Water**

APL and Blue Water had numerous communications regarding the disposition of the garlic. On April 21, 2003, a Blue Water employee, Frank Xu, sent a fax to APL acknowledging that the first five containers (which had arrived in the United States on March 31, 2003) were "on demurrage" and reporting that Akata intend-

---

**3.** APL's expert, John Day, explained Customs' control over imported merchandise as follows:

> All imported merchandise remains under the custody U.S. Customs until it is authorized for release by the port director of U.S. Customs. In order for U.S. Customs to release the merchandise, the importer of record, who is the consignee, owner or purchaser, must first file an entry with U.S. Customs. The consignee can be identified from the House Bill of Lading ("HBL"), which is the negotiable instrument upon which merchandise can be delivered. An HBL is contrasted with a Master Bill of

> Lading ("MBL"), which refers to a contract between a carrier and an intermediary party, such as an NVOCC.
>
> The consignee on an MBL is known as a "nominal consignee," and generally is the freight forwarder or NVOCC. Nominal consignees are not authorized to file U.S. Customs entries. . . .
>
> When a hold is placed on merchandise, the consignee is responsible for complying with the governmental requirements that may cause or have caused the holds.

Expert Report of John Day, dated April 21, 2006 (the "Day Report") at 1–2 (internal citations omitted).

ed to take delivery of the cargo: "We are informed by our customer [Akata] and their broker … that they are trying to clear it ASAP now. And it is expected to be done early this week." *Id.* ¶ 57.

On May 7, 2003, an APL employee, Liam Powers, emailed Mr. Xu regarding the demurrage charges that were accruing on the containers. *Id.* ¶ 58. He wrote as follows:

The problem with the containers on the west coast is getting worse.

The [26 containers associated with 12 bills of lading listed] below have been sitting for over 30 days and have nearly $75,000 in demurrage due.

This is to inform you that we are about to start the process of sending the containers to G.O. for auctioning of the product.

Please advise if you or your customer is going to pay for these and pick them up by Friday. . . .

*Id.* ¶ 58. Mr Xu replied that he had finally been "in touch with AKATA, and was told that their lawyer is working on this case now. [Their lawyer] asked whether we can give him some extra time for finishing the mess." *Id.* ¶ 58. Mr. Powers responded that he didn't think APL could give Akata any more time to pick up the cargo than two more days, that is, until May 9, 2003. *Id.* ¶ 58. Mr. Xu "agree[d] with [this] idea," stating that "Frida[y, May 9, 2003,] is the last day." *Id.* ¶ 58.

### 4. APL's Communications with Customs

Ten days later, on May 19, 2003, Mr. Porter called Customs Inspector Rachel S. Ybarra to see how APL could dispose of the cargo within Customs regulations. *Id.* at *14 ¶ 59. Having spoken with Inspector Ybarra, Mr. Porter emailed Mr. Powers and stated that "she advises [that the] cargo must remain intact w/seals for the 6

mos required, if these do not clear customs." *Id.* ¶ 59. Concerned about the demurrage charges that would accrue if the containers were required to be sealed and left on the dock for six months, Mr. Powers spoke with Inspector Ybarra on May 21, 2003 and reported to Kris Stephens, of APL's Custom Compliance Group, that "she advises that under 19 CFR sec 4.37E[e] does not allow cargo to be moved to cold storage. Also, since it is under constructive G.O. it is to be held on dock until 6 months." *Id.* at *15 ¶ 60.

On May 22, 2003, Ms. Stephens contacted Inspector Ybarra's supervisor and left a message regarding the garlic shipments. *Id.* ¶ 61. Since Ms. Stephens was leaving for vacation, she asked Kellie Reynolds, an APL Customs Compliance Representative, to follow-up with Inspector Ybarra's supervisor, having left Ms. Reynolds' contact information in her message to the supervisor. *Id.* ¶ 61. The supervisor called Ms. Reynolds on May 23, 2003 and left the FDA's phone number with her. *Id.* ¶ 62.

Later that day, Ms. Reynolds called the supervisor back and also attempted to call the FDA three or four times. *Id.* ¶ 63. Meanwhile, APL's Claims Department engaged a surveyor to determine whether the garlic was still saleable. *Id.* ¶ 64. The purpose of this survey was "to convince U.S. Customs to act quickly" so that the perishable garlic did not spoil. *Id.* ¶ 64 (citation omitted). It was not until June 5, 2003, however, that Inspector Ybarra advised APL that a quick sale procedure could be used to dispose of the garlic. *Id.* at *16 ¶ 66.

### 5. Destruction of the Garlic Shipments

On June 11, 2003, Inspector Ybarra advised Mr. Porter that, in order to effect a quick sale of the cargo, he needed to call Cindy Ewers at Crescent, where the ship-

ments of garlic were in constructive G.O. and arrange for Ms. Ewers to send Inspector Ybarra the required documentation. *Id.* ¶ 68. Later that day, Mr. Porter sent a fax to Ms. Ewers requesting that Crescent fill out the required 5251 forms. *Id.* ¶ 68. Because Ms. Ewers did not initially realize that Crescent needed to fill out the 5251 forms and send them to Customs, it was not until 12 days later, on June 23, 2003, that she sent Customs the forms. *Id.* ¶ 69.

By that point, however, an FDA inspector conducting an initial investigation had determined that at least some of the garlic was no longer saleable and would have to be destroyed. *Id.* at *17 ¶ 70. A more thorough FDA investigation occurred on July 16, 2003, the earliest day an FDA Inspector was available, and the FDA determined that none of the garlic in the 26 remaining containers was saleable. *Id.* ¶¶ 71–72. The garlic was therefore destroyed at the expense of APL between August 13 and August 25, 2003. *Id.* at *18, ¶ 74.

## B. Procedural History

### 1. The District Court's Decision After Trial: *APL I*

On April 1, 2005, APL filed suit seeking $474,072.18 in damages from Blue Water. *Id.* ¶ 77. This amount consisted of (1) $402,700.00 in demurrage for the 29 containers; (2) $2,600.00 for a survey of the cargo in May 2003; (3) $425.00 for a survey of the cargo prior to its destruction; (4) $62,192.18 for the cost of destruction; and (5) $6,155.00 for various miscellaneous items. *Id.* ¶ 77.[4]

Judge Eaton, to whom the parties had consented to handle the case for all pur-

poses under 28 U.S.C. § 636(c), concluded that Blue Water constituted a "Merchant" under the MBLs, thus rendering it liable to APL for the damages listed above pursuant to clauses 14(iii) and 21(iii), (iv), and (ix) of the MBLs' terms and conditions. *Id.* at *20 ¶¶ 86–90. He reached this conclusion on two separate grounds. *Id.* ¶¶ 86, 88. First, 46 U.S.C. § 40102(16) defines a NVOCC such as Blue Water as a Shipper and, under Clause 1 of the terms and conditions of the MBLs, a Shipper falls within the definition of Merchant. *Id.* ¶ 86. Second, on the MBLs, Blue Water is listed as the Consignee and Notify Party; a Consignee also falls within the definition of Merchant. *Id.* ¶ 88; *see also id.* at *1 ¶ 4.

Clause 14(iii) of the terms and conditions of the MBLs provides, in relevant part, that "[a]ll charges due hereunder together with Freight … shall be due from and payable on demand by the Merchant (who shall be jointly and severally liable to the Carrier therefore).…" *Id.* at *1 ¶ 4. Meanwhile, Clause 21(iii)-(v) of the terms and conditions of the MBLs provide that the Merchant is required to take delivery of the goods, and that any costs or expenses resulting from a failure to do so— including the costs to store, sell or destroy the goods—are the responsibility of the Merchant. *Id.* at *20 ¶ 90; *id.* ¶ 4. Consequently, Judge Eaton concluded that Blue Water, as Merchant, was contractually liable for the costs and expenses APL incurred as a result of Akata's failure to pick up the garlic shipments. *Id.* at *20 ¶¶ 90–91.

Blue Water was not liable for the full amount of the damages, however, as Judge

---

4. For reasons that remain unclear, on May 5, 2003 three of the 29 reefers went off demurrage, and their contents were sold for $825.00. *Id.* at *12 ¶ 57. APL accordingly notes that its principal claim is $473,247.18 (*i.e.,* 474,072.18–$825.00). Plaintiffs' Memorandum of Law on Remand dated September 2, 2010 ("Pls.' Mem.") at 2 n.3, 14 n.9.

Eaton found that APL's mitigation efforts were not within the "range of reason" standard enunciated in *Ellerman Lines, Ltd. v. President Harding*, 288 F.2d 288, 290 (2d Cir.1961). More specifically, he ruled that APL's efforts were not within the range of reason because (1) APL delayed in asking Crescent, the G.O. Warehouse, and Customs to authorize a quick sale; (2) APL delayed in asking Crescent to prepare and submit forms to Customs to authorize the disposition of the garlic; and (3) APL "failed to pressure" and follow up with Crescent in order to expedite the quick sale process. *APL I*, 2008 WL 539927, at *22 ¶¶ 101–04.

Had APL acted reasonably, Judge Eaton found, a quick sale of the cargo likely "would have been completed no later than May 30," thus ending the accrual of demurrage charges and forestalling the need to incur costs destroying the garlic. *Id.* ¶ 102. Based on a May 23 survey of the garlic, Judge Eaton inferred that the garlic would have still been saleable on May 30, but also acknowledged the possibility that Customs or Crescent would have delayed a quick sale of the garlic beyond that date, likely rendering some of the garlic rotten. *Id.* at *23 ¶ 103. Judge Eaton resolved this tension by holding Blue Water liable for all demurrage charges incurred through June 7, 2003 plus $8,755.00, representing the cost of the surveys of the cargo and other various miscellaneous expenses, along with pre-judgment interest. *Id.* ¶¶ 104–05. Judgment was thus entered in the amount of $184,910.00 for demurrage and other expenses and $62,413.86 for prejudgment interest. Judgment dated March 18, 2008 (Dkt. No. 34). Blue Water paid the judgment on March 14, 2008 (Dkt. No. 36).

### 2. The Second Circuit's Decision: *APL II*

APL appealed; on appeal, the question before the Second Circuit was as follows:

> [W]hether the district court properly found that APL had failed to reasonably mitigate the loss caused by Blue Water's breach and that the corresponding reduction in the amount of damages awarded was appropriate.

*APL II*, 592 F.3d at 109. It answered this question in the negative and concluded that the trial court had failed to properly assess whether APL's various mitigation efforts—and its missteps—were within the "range of reason" standard enunciated in *Ellerman, Id.* at 111.

The Second Circuit found that while the trial court had identified the proper legal standard regarding mitigation, it had failed to properly apply that standard to APL's mitigation efforts. *Id.* To this end, the Circuit observed:

> That the missteps happened is not denied; missing is an analysis of these shortcomings against the more forgiving standard accorded a party that has fully performed all of its contract obligations and is thrust into the shoes of the breaching party as it scrambles to mitigate the impact of the breach. The trial court's obligation was to determine whether the mitigation efforts actually chosen in those unaccustomed shoes were reasonable, not whether hindsight suggests that an objectively better choice was available.

*Id.* at 112 (citation omitted). Such an inquiry, the Second Circuit noted, would necessarily begin with the expectations of the parties as revealed by their contract. *Id.* It also suggested that Blue Water's knowledge of Customs rules and regulations, along with its post-breach conduct, may "provide a yardstick by which to measure the reasonableness of APL's mitigation efforts." *Id.*

In addition, the Second Circuit found shortcomings in the trial court's assess-

ment of the acts and omissions of Blue Water. *Id.* at 112–13. It noted that the court's "finding of [Blue Water's] contractual breach [was] only implicit," *id.* at 111 n. 2, and that the court's opinion lacked almost any factual findings regarding what role, if any, Blue Water should have had in the process of the disposal of the garlic. *Id.* at 112. Moreover, it noted that "no analysis of APL's mitigation efforts, to be judged against the forgiving standard of reasonableness, could be complete without a commensurate analysis of Blue Water's post-breach conduct." *Id.* at 112–13. Consequently, the Second Circuit "vacate[d] that portion of the final judgment ... that reduced the amount of damages awarded [APL] for failure to mitigate its loss" and remanded the case "for further proceedings consistent with this opinion." *APL II,* 592 F.3d at 113.

By Order dated June 18, 2010, I directed each party to simultaneously file and serve a memorandum of law addressing the issues that each believes the Court should address on remand. Dkt. No. 43.[5] On September 2, 2010, APL filed its memorandum of law, *see* Pls.' Mem. (Dkt. No. 44), and Blue Water did the same, *see* Memorandum Regarding Issue on Remand dated September 2, 2010 ("Def.'s Mem.") (Dkt. No. 45).

## II. DISCUSSION

The issues before the Court on remand are narrow: to determine whether APL's mitigation efforts were within the range of reason and, if so, the proper award of damages to which APL is entitled.

### A. Legal Standard—The Mandate Rule

 Under the law-of-the-case doctrine, "when a court decides upon a rule of

law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citation omitted). The mandate rule is a subsidiary of the law-of-the-case-doctrine that governs the relationship between appellate courts and trial courts, and it controls the scope of the inquiry a trial court may make in a case remanded from a circuit court. *United States v. Ben Zvi,* 242 F.3d 89, 95 (2d Cir.2001); *see generally* C. Wright, *et al., Federal Practice & Procedure* § 4478.3, at 733–69 (3d ed. 2008). The mandate rule provides: "where issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court." *Burrell v. United States,* 467 F.3d 160, 165 (2d Cir. 2006) (citing *United States v. Minicone,* 994 F.2d 86, 89 (2d Cir.1993) and *Ben Zvi,* 242 F.3d at 95). The rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court." *Ben Zvi,* 242 F.3d at 95 (internal quotations and citations omitted). To determine whether an issue may be reconsidered on remand, a district court "should look to both the specific dictates of the remand order as well as the broader spirit of the mandate," *id.* (internal quotation marks and citation omitted), and it " 'must always look to the opinion to interpret the mandate.' " *Meacham v. Knolls Atomic Power Lab.,* 358 Fed.Appx. 233, 235 (2d Cir.2009) (summary order) (quoting *FTC v. Standard Educ. Soc'y,* 148 F.2d 931, 932 (2d Cir.1945)).

The mandate here provides as follows:

No. 41.

---

**5.** This case was reassigned to me in March 2010 upon Judge Eaton's retirement. Dkt.

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the judgment of the District Court is VACATED in part, as to the portion of the judgment that reduced the amount of damages, and REMANDED in accordance with the opinion of this Court. Mandate of United States Court of Appeals for the Second Circuit filed January 8, 2010 (Dkt. No. 38). The Second Circuit's decision contained similar language and provided that "we vacate that portion of the final judgment entered below that reduced the amount of damages awarded appellant for failure to mitigate its loss and remand this matter to the district court for further proceedings consistent with this opinion." *APL II*, 592 F.3d at 113.

Consequently, pursuant to the mandate, the Court must determine whether APL's mitigation efforts were within the range of reason and whether APL may recover the full amount of the damages that it originally sought from Blue Water. Consistent with the other dictates in the Second Circuit's opinion, the Court must also (1) more clearly define the nature and circumstances of Blue Water's breach; and (2) examine Blue Water's post-breach conduct, including the role, if any, it should have had in the disposal process. *Id.* at 112–13. Each of these determinations requires the Court to make additional conclusions of law pursuant to Fed. R. Civ, P. 52(a). The Court makes each of these additional conclusions of law in turn below.[6]

## B. Blue Water's Breach

The nature and circumstances of Blue Water's breach of the MBLs at issue in this case are straightforward. In short, Blue Water, as "Merchant" under the MBLs, was obligated under Clauses 13, 14, and 21 of the MBLs to pay APL, as "Carrier" under the MBLs, for the costs associated with Akata's failure to pick up the garlic, and Blue Water breached this obligation when it failed to pay APL. *APL I*, 2008 WL 539927, at *20 ¶¶ 86–90; *see also* Part I.B.1, *supra.*

These clauses, in relevant part, provide as follows:

> The Merchant shall comply with all regulations or requirements of customs, port and other authorities, and shall bear and pay all duties, taxes, fines, imposts, expenses or losses....

> All charges due hereunder together with Freight ... shall be due from and payable on demand by the Merchant (who shall be jointly and severally liable to the Carrier therefore) at such port or place as the Carrier may require, Vessel or cargo lost or not lost from any cause whatsoever....

> If the delivery of the Goods is not taken by the Merchant when and where the Carrier is entitled to call upon the Mer-

---

**6.** Blue Water contends that "the Second Circuit ... clearly contemplates that the trial court will on remand consider additional facts in determining whether APL's conduct was within the range of reason." Def.'s Mem. at 18. I disagree. Nowhere in *APL II* does the Second Circuit direct the Court to conduct additional fact finding. Instead, the Second Circuit recognizes that "th[e] appeal turns on the application of well-settled principles" of law, *APL II*, 592 F.3d at 111, and simply directs that the Court assess on remand the proper application of these principles to the facts in the record. *Id.* at 111–13.

Blue Water also argues that "[n]ow that the trial court's analysis and understanding of the application of the legal standard have been called into question, it would be inequitable to limit the trial court on remand to only those facts previously thought to be relevant." Def.'s Mem. at 18–19. Yet Blue Water provides no support for this assertion and points to no additional evidence in the record that would affect the application of the law to the facts in the record. If anything, the only additional fact-finding contemplated by the Second Circuit pertains to Blue Water and its breach, not to APL's conduct.

chant to take delivery thereof, the Carrier shall be entitled . . . to . . . store the Goods . . . and the costs of such storage . . . shall forthwith upon demand be paid by the Merchant to the Carrier. . . .

If the Merchant fails to take delivery of the Goods . . . or if in the opinion of the Carrier they are likely to deteriorate, decay, become worthless or incur charges . . . , the Carrier may . . . at the sole risk and expense of the Merchant, sell, destroy or dispose of the Goods. . . .

*Id.* at *1 ¶ 4 (citing MBL terms and conditions Clauses 13(iii), 14(iii), 21(iv), 21(v)). All costs associated with Akata's failure to pick up the garlic fall within these provisions: (1) $402,700.00 in demurrage for the 29 containers; (2) $2,600.00 for a survey of the cargo in May 2003; (3) $425.00 for a survey of the cargo prior to its destruction; (4) $62,192.18 for the cost of destruction; and (5) $6,155.00 for various miscellaneous items. *Id.* at *18 ¶ 77.

Both APL and Blue Water agree that Blue Water's failure to pay APL for these expenses constitutes the proper characterization of Blue Water's breach. *See* Def.'s Mem. at 14–15 ("[T]he specific nature of the breach in this case is clear from the record. Blue Water failed to pay demurrage and other charges assessed by APL in connection with the garlic shipments."); Pls.' Mem. at 19 ("Clauses 14(iii) and 21 [of the MBLs' terms and conditions], when read together, make Blue Water contractually liable for the costs associated with Akata's failure to pick up the garlic").

### C. Blue Water's Post–Breach Conduct

An analysis of Blue Water's post-breach conduct is similarly straightforward. Blue Water, as a NVOCC, had no role to play in the disposition of the garlic shipments and no standing with Customs to attempt to expedite the shipments' disposition.

Again, the parties agree with this characterization. Pls.' Mem. at 19–20; Def.'s Mem. at 15–16 & n.11.

The report of APL's expert, John Day, which Judge Eaton relied on extensively, clarifies the lack of involvement of a NVOCC such as Blue Water in the process of releasing cargo under the control of Customs. *See* Day Report at 1–2. His report, in relevant part, provides as follows:

All imported merchandise remains under the custody U.S. Customs until it is authorized for release by the port director of U.S. Customs. In order for U.S. Customs to release the merchandise, the importer of record, who is the consignee, owner or purchaser, must first file an entry with U.S. Customs. The consignee can be identified from the House Bill of Lading ("HBL"), which is the negotiable instrument upon which merchandise can be delivered. An HBL is contrasted with a Master Bill of Lading ("MBL"), which refers to a contract between a carrier and an intermediary party, such as an NVOCC. The consignee on an MBL is known as a "nominal consignee," and generally is the freight forwarder or NVOCC. Nominal consignees are not authorized to file U.S. Customs entries. . . .

When a hold is placed on merchandise, the consignee is responsible for complying with the governmental requirements that may cause or have caused the holds.

*Id.* at 1–2. Here, the HBLs listed Akata as the Consignee and Notify Party, while the MBLs listed Blue Water as the Consignee and Notify Party. *APL I,* 2008 WL 539927, at *12 ¶¶ 49–50. Blue Water was thus the "nominal consignee" of the garlic shipments at issue and was not authorized to file the necessary entries with Customs that were required for the release of the shipments. Instead, only Akata, the con-

signee on the HBL and the importer of record, was authorized to do so. Blue Water thus had no standing to contact Customs or in any way facilitate the disposition of the garlic. Moreover, Mr. Day stated as much at trial. Trial Tr. at 347. Although Akata's failure to arrange for the cargo's release from Customs affected Blue Water's ultimate contractual responsibility—and liability—for the damages APL incurred, it did not change the fact that Blue Water had neither standing to communicate with Customs nor the ability to arrange for the disposition of the cargo without the participation of Akata.

Accordingly, I conclude that Blue Water had no role to play in the disposition of the cargo. I now turn to an analysis of APL's mitigation efforts against the range of reason standard.

### D. APL's Mitigation Efforts

■■■■ As both Judge Eaton and the Second Circuit found, the reasonableness of APL's mitigation efforts is governed by the standard articulated in *Ellerman*. Under this standard, "if plaintiff takes such [mitigating] action within the range of reason," the breaching party remains liable if such reasonable attempts at mitigation fail. *Ellerman*, 288 F.2d at 290. "The standard of what reason requires of the injured party is lower than in other branches of law." *Id.* For the reasons discussed below, I conclude, in applying the *Ellerman* standard, that APL's mitigation efforts fell within the range of reason.

After the garlic shipments failed to clear Customs, APL properly initiated the G.O. process by informing Crescent, the G.O. Warehouse, and Customs that the cargo was perishable fresh garlic and requesting that the cargo be placed in constructive G.O. in order to preserve it. *APL I*, 2008 WL 539927, at *13 ¶ 55. The garlic was then placed in constructive G.O. and remained in APL's containers "pending the disposition of the cargo at Customs's direction." *Id.* ¶ 56. APL realized the demurrage charges that would accrue during that period would be quite substantial; accordingly, it had numerous communications with Blue Water regarding whether Akata still intended to pick up the garlic. *Id.* ¶¶ 57–58.

The record is undisputed that, after learning definitively from Blue Water that Akata would not be picking up the garlic,[7] APL contacted various parties within Customs and the FDA several times during May 2003 in order to facilitate the garlic's disposition. *Id.* at *15–16 ¶¶ 61–64, 66. While it is true that due to confusion within APL regarding the quick sale procedure, APL did not initiate contact with Customs until May 19, 2003—ten days after the May 9, 2003 deadline for Akata to pick up the garlic—APL's delay was nevertheless within the range of reason. This is so particularly because APL labored under the misapprehension that the relevant regulations required the garlic in constructive G.O. to remain on the dock for six months, a misapprehension that APL believed was later confirmed by Customs Inspector Ybarra. *Id.* ¶ 59. In spite of various communications with Customs re-

---

7. The record demonstrates that APL and Blue Water went back and forth on this point, such that the time for APL to start mitigating potential damages did not accrue until at the earliest, May 9, 2003—after "a pivotal exchange of e-mails on May 7th in which APL informed Blue Water that approximately $75,000 in demurrage had accrued on 26 of the reefers," *APL II*, 592 F.3d at 109, and APL "declared that the garlic had to be collected by May 9th or be sent to auction," *id.* at 110, a course of action to which Blue Water agreed. *APL I*, 2008 WL 539927, at *13–14 ¶ 58; Part I.A.3 *supra*.

garding the demurrage charges that would accrue during the six month period, including one that "expres[sed] the urgency of the matter" to Customs, *id.* ¶ 60, APL did not learn that a quick sale could be used to dispose of the garlic until June 5, 2003, *id.* at \*16 ¶ 66.

Once APL learned this fact, it contacted Crescent several times in June in order to expedite the quick sale process, as only Crescent could initially request the sale from Customs and provide Customs with the required 5251 forms to effectuate the sale. *Id.* ¶ 68; *id.* at \*19 ¶ 80. However, due to confusion within Crescent, its transmission of the required forms was delayed nearly two weeks and by June 23, 2003, the date Crescent eventually sent the required forms to Customs, some of the garlic was no longer saleable. *Id.* at \*17 ¶ 70.[8] Moreover, any possible quick sale of the garlic was further delayed because an FDA investigation into the saleability of the garlic did not occur until July 16, 2003, the earliest day an FDA Inspector was available, *id.* ¶ 72, in spite of various communications from APL to the FDA in which APL attempted to "apply extra pressure [on the FDA] so the matter could be resolved promptly[,]" *id.* ¶ 71. The failure of APL's pressure on the FDA to expedite the disposition of the garlic is perhaps unsurprising. Indeed, this result was consistent with the results of so many of APL's previous attempts to pressure the various parties who ultimately had control over the process of the disposition of the garlic, control that APL itself did not have.

Taken together, APL's mitigation efforts fall within the range of reason.[9] Many of the delays that APL experienced in attempting to minimize demurrage charges and eventually effectuate a quick sale of the garlic were caused by third parties—Customs, Crescent, and the FDA—whom APL could only push so much. And push APL did; the record is undisputed that APL frequently communicated with Customs and the FDA in an effort to minimize the quickly mounting demurrage charges and maximize the chances that the garlic could be sold through a quick sale. As the Second Circuit observed, "[t]o suggest that an injured party should have damages caused by another's breach reduced because the injured party failed to incessantly push a government agency to do its job more expeditiously is a highly dubious proposition." *APL II*, 592 F.3d at 112 n. 4. The same can also be said of APL's communications with Crescent.

---

8. Despite having received a fax from APL's Mr. Porter requesting that Crescent send Inspector Ybarra the required documentation, Ms. Ewers, of Crescent, did not initially realize that it was Crescent's responsibility to send the documentation to Customs. *Id.* ¶¶ 68–69. Only after Ms. Ewers consulted with Customs did she "reluctantly agree[] that U.S. Customs would only accept the [required forms] from the G.O. Warehouse, ... and sen[d] them to U.S. Customs on June 23, twelve days after Mr. Porter's request." *Id.* ¶ 69.

9. Although the Second Circuit stated that "Blue Water's own knowledge of Customs rules and regulations and its post-breach conduct perhaps provide a yardstick by which to measure the reasonableness of APL's mitigation efforts[,]" in light of Blue Water's role as a NVOCC, such knowledge and conduct provides little insight here. Blue Water concedes as much: "Large ocean carriers like APL have significant obligations and frequent dealings with Customs ..., while small NVOCCs [like Blue Water] do not." Def.'s Mem. at 16 n. 11. Moreover, as discussed in Part II.C. *supra*, Blue Water, as a NVOCC, played no role in the disposition of the garlic shipments and had no standing with Customs to do so.

Although APL ultimately could not force these entities to move more quickly to effectuate a quick sale of the garlic, it certainly took reasonable steps to try. While it may be easy to evaluate the sufficiency of APL's efforts in hindsight and fault APL for, among other things, its erroneous belief that a quick sale could not take place until the cargo remained on the dock for six months, its failure to ask Customs or Crescent explicitly for a quick sale, or its failure to sufficiently pressure these entities to take the necessary steps to effectuate a quick sale, this the Court cannot do. Indeed, the rule of mitigation of damages is "not whether hindsight suggests that an objectively better choice [by APL] was available" but "whether the mitigation efforts actually chosen ... were reasonable, ...." *APL II*, 592 F.3d at 112 (citing *Ellerman*, 288 F.2d at 290). APL meets that standard here—one that the Second Circuit reaffirmed in *APL II* is "lower than" in other contexts. *Id.* at 111.

### E. Award of Additional Damages

■ Accordingly, I award APL damages of $288,337.18. This amount represents $474,072.18—the total amount Blue Water was obligated to pay under the MBLs—less (1) $184,910.00, the amount awarded in *APL I* and previously paid by Blue Water, and (2) $825.00 in salvage proceeds from sales of garlic in the three of the 29 containers that were taken off demurrage and had their contents sold.[10]

■ APL also seeks pre-judgment interest, though it does not specify the rate of interest that it believes should be applied to the damages award. Pls.' Mem. at

2. Blue Water does not address the issue of pre-judgment interest in its submission to the Court. "In this Circuit, prejudgment interest will be denied in admiralty cases only under extraordinary circumstances." *Federal Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 352 n. 4 (2d Cir.1986) (citation omitted). There are no such circumstances here, so APL is entitled to pre-judgment interest.

■ The appropriate rate of interest and the date when such interest begins is within the broad discretion of the district court. *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir.2001) (citation omitted); *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir.1982). "Interest is intended to make the injured party whole, and generally should be measured by interest on short-term, risk-free obligations." *N.Y. Marine & Gen. Ins. Co.*, 266 F.3d at 131 (citations omitted). "[A]n award of interest based on the average annual United States Treasury Bill rate is becoming more common in this Circuit. The treasury bill rate more closely parallels the income the damages would have earned in a short-term, risk-free investment." *Man Ferrostaal, Inc. v. M/V Akili*, Nos. 07 Civ. 6269(DLC), 09 Civ. 2408(DLC), 763 F.Supp.2d 599, at 614, 2011 WL 207968, at *11 (S.D.N.Y. Jan. 24, 2011) (citation, internal quotations, and alterations omitted); *see also N.Y. Marine & Gen. Ins. Co.*, 266 F.3d at 131 (approving of application of average annual Treasury Bill yield in admiralty action). Moreover, "in the absence of a single date from which damages flowed, a reasonable intermediate date,"

---

10. In *APL I*, Judge Eaton directed APL to explain whether it received any proceeds from the sale of garlic in three containers that went off demurrage and, if so, why Blue Water should not receive a credit to the extent of such proceeds. *APL I*, 2008 WL 539927, at *13 ¶ 57, *18 ¶ 75, *24 ¶ 108. The $825.00 in proceeds from the sale is thus taken into account here. *See* Pls.' Mem. at 14 n.9.

should be used to calculate interest. *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 828 F.Supp. 1098, 1113 (S.D.N.Y.1993). Here, that reasonable intermediate date is June 17, 2003—the midpoint between April 9, 2003, the first date demurrage was assessed on the shipments of garlic, and August 25, 2003, the date the last shipment of garlic was destroyed. *See* Pls.' Trial Ex. 98 (APL 00126); Pls.' Trial Ex. 99 (APL 00028).

Accordingly, APL is entitled to 2.035 percent pre-judgment interest from June 17, 2003 through the entry of judgment on $288,337.18.[11]

## III. CONCLUSION

For the reasons discussed above, I conclude that APL's mitigation efforts were within the range of reason and therefore award APL damages of $288,337.18 plus 2.035 percent pre-judgment interest to be calculated by the Clerk of the Court from June 17, 2003 through the entry of judgment. The Clerk of the Court is directed to enter judgment consistent with this decision.

**SO ORDERED.**

---

**11.** *See* Board of Governors of the Federal Reserve System, Historical Average Annual 3 Month Treasury Bill Rate, http://www. federalreserve.gov/releases/h15/data.htm (last visited April 22, 2011).